**Rosemarie SATTERFIELD, as Representative of the Estate of Jerrold Braley, Deceased, Appellant,**

v.

**CROWN CORK & SEAL COMPANY, INC., Individually and as Successor to Mundet Cork Corporation, Appellee.**

No. 03–04–00518–CV.

Court of Appeals of Texas, Austin.

Aug. 29, 2008.

Rehearing Overruled Oct. 7, 2008.

the officer to remove it, open it to see if it was so constructed, and then hand it to appellant.").

Deborah G. Hankinson, Elana S. Einhorn, Law Offices of Deborah Hankinson, P.C., Dallas, Jeffery Mundy, Michael Singley, Mundy & Singley, L.L.P., Austin, for appellant.

Thomas R. Phillips, Baker Botts, L.L.P., Austin, David Lyman Crump, University of Houston Law Center, Kimberly Stuart, Frank G. Harmon III, Crain, Caton & James, P.C., Houston, for appellee.

Before Chief Justice LAW, Justices PATTERSON and HENSON.

### *OPINION*

JAN P. PATTERSON, Justice.

The issue presented is whether a statute that extinguishes a litigant's right to pursue an accrued and pending common law cause of action—without providing a grace period—transcends the legislature's power. Within that context, does the presumption of a statute's constitutionality

survive an express prohibition of the Texas Constitution? Appellant Rosemarie Satterfield, representative of the Estate of Jerrold Braley, seeks damages for injuries that Braley sustained by his exposure to asbestos-containing products. In this appeal, we review the judgment of the district court granting summary judgment to appellee Crown Cork & Seal Company, Inc., pursuant to a newly enacted statute that limits the asbestos-related liabilities of certain successor corporations. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 149.001–.006 (West 2005) (hereinafter "the Statute").

After Braley sued Crown Cork and others for damages caused by his exposure to asbestos-containing products, the trial court granted partial summary judgment in Braley's favor. Within days, the Texas Legislature enacted—and made immediately effective—the Statute, which effectively barred any recovery from Crown Cork.[1] Crown Cork then filed a motion for summary judgment based on its new statutory affirmative defense under the Statute, arguing that, because it had already paid successor asbestos claims in excess of the liability limit under the Statute, it had no further liability in any asbestos case, including Braley's. The district court granted the motion and severed Braley's claims against Crown Cork from those against the other defendants. This appeal followed.

In three issues, Satterfield contends that Crown Cork was not entitled to summary judgment because: (i) the Statute, which imposes certain limits on the liability of corporations that became successors to corporations that were involved in the as-bestos-insulation business, violates the Texas Constitution's prohibition on retroactive laws as applied because it deprives her of all remedy for an accrued and pending cause of action, thereby extinguishing a vested right; (ii) the Statute, on its face, violates the Texas Constitution's prohibition on special laws because it grants special privileges to a particular class for the advancement of private, rather than public, interests; and (iii) Crown Cork failed to conclusively establish as a matter of law the elements of its newly created affirmative defense under the Statute and, therefore, is not entitled to summary judgment. Because the Legislature may not make a law that the Texas Constitution prohibits and the Constitution expressly forbids retroactive laws that impair vested rights, the question presented is whether an accrued and pending common law cause of action is a vested right and thus protected by the Texas Constitution. We conclude that it is a vested right and that therefore the Statute is unconstitutional as applied to Braley's claim because, in the absence of a grace period, the Statute is a retroactive law impairing his vested rights.[2]

Accordingly, we sustain Satterfield's first issue, and we reverse the trial court's summary judgment granted in favor of Crown Cork and remand for further proceedings.

## BACKGROUND

### The Parties

After receiving an honorable discharge from the United States Army in 1956, Jerrold Braley returned to his home in Wyoming but then moved his family to

1. In response to Satterfield's summary judgment motion, Crown Cork did not contest successor liability as to actual and compensatory damages. It disputed only any claim as to punitive damages.

2. In light of our disposition of the challenge to the constitutionality of the Statute as applied, we do not reach Satterfield's remaining issues.

Texas to work as an industrial laborer at an oil refinery near Monahans. Acquiring skills to become a pipefitter and welder's helper, over the next several years Braley worked at refineries, chemical plants, gas plants, and at other industrial job sites in Texas, Wyoming, Oklahoma, Kansas, New Mexico, Florida, and Louisiana. These jobs involved working with pipes, boilers, compressors, and other machinery requiring insulation, which routinely involved asbestos insulation, including asbestos-containing insulation products manufactured by Crown Cork's predecessor—Mundet Cork Corporation. Braley worked until he retired in 1996.

Crown Cork is a manufacturer and distributor of packaging products for consumer goods. In 1963, Crown Cork, then a New York corporation, was the nation's largest producer and seller of metal bottle caps, known in the industry as "crowns." Mundet was also a large producer and seller of crowns and consisted of two divisions: the "closure" division, which manufactured crowns, and the "thermal insulation" division, which manufactured, sold, and installed insulation products, some of which contained asbestos. Seeking to acquire the assets of Mundet, in November 1963, Crown Cork purchased the majority of Mundet stock. Approximately three months later, on February 8, 1964, Mundet sold its insulation division to Baldwin–Ehret–Hill ("B–E–H"). It is undisputed in the summary judgment proof that B–E–H expressly agreed to assume only the liabilities of Mundet's thermal insulation division arising after February 8, 1964. Mundet thus retained all liability arising from any exposure to its asbestos-containing products before the date of the asset sale. Crown Cork acquired the remainder of Mundet stock, and the remaining assets of Mundet were transferred to Crown Cork by merger in 1966. In 1989, Crown Cork merged into a new Pennsylvania corporation of the same name.

### The Lawsuit

In July 2002, Braley was diagnosed with mesothelioma, a fatal form of cancer associated with exposure to asbestos. On October 1, 2002, Braley sued Crown Cork and others[3] for damages caused by his exposure to asbestos-containing products. In his live pleading at the time—Plaintiffs' Fourth Amended Petition and Jury Demand—Braley asserted common law causes of action for negligence and strict products liability. Braley's petition also sought to impose liability against Crown Cork as successor to Mundet. In November, Braley moved for partial summary judgment to establish Crown Cork's liability for Mundet's asbestos-containing products as a result of Crown Cork's acquisition and merger. Arguing that Pennsylvania law controls because it has the most significant relationship to the issue of whether Crown Cork should be liable for Mundet's liabilities, Crown Cork asserted that Texas "has nothing but a tenuous relationship."[4] Crown Cork did

---

**3.** In addition to Crown Cork, Braley sued A.W. Chesterton Company; Babcock Borsig Power, Inc.; Coltec Industries, Inc.; Crane Company; Dana Corporation; Durabla Manufacturing Co.; Enpro Industries, Inc.; Exxon Mobil Corp.; Foster Wheeler Energy Corp.; Garock Sealing Technologies, LLC; General Electric Company; Goodrich Corp.; Guard–Line, Inc.; John Crane, Inc.; Metropolitan Life Insurance Company; Northern Natural Gas Co.; Rapid American Corp.; and 3M Company.

**4.** Initially, Crown Cork agreed with Satterfield that Texas law does not apply and that Texas does not have "an interest in the application of its law to the Plaintiff's claim or recovery of damages." According to Crown Cork, "only Pennsylvania has any interest in the outcome of this case." Four days after the trial court granted partial summary judg-

not dispute that it was the successor by merger to Mundet and, therefore, liable for Mundet's tortious conduct under Texas law,[5] nor did it dispute that it was liable for actual and compensatory damages attributable to Braley's exposure to Mundet's products.[6]

On May 29, 2003, the trial court entered an order granting Braley's motion for partial summary judgment on the successor liability issue, finding that Crown "is liable for injuries, actual and punitive damages, as may be proven at trial, caused by the asbestos-containing products manufactured, sold or distributed by Mundet[ ] before February 8, 1964, as a result of Crown Cork's[ ] acquisition and merger of Mundet[ ] into Crown Cork." The trial court further found that the judgment "only determines that in the event the jury finds Mundet Cork was negligent, grossly negligent, acted with malice, or its products were defective that Crown Cork is liable and bears the responsibility for the findings against Mundet Cork." Issues of negligence, product defect, gross negligence, and damages remained to be determined by the jury.[7]

### The Statute

Four days after the trial court granted Satterfield's motion for partial summary

judgment, ruling that Crown Cork was liable as successor to Mundet, the Legislature passed House Bill 4. Act of June 2, 2003, 78th Leg., R.S., ch. 204, 2003 Tex. Gen. Laws 847. Section 17 of House Bill 4—the Statute—created an affirmative defense to successor liability for asbestos claims by limiting cumulative successor liability to the fair market value of the predecessor company as of the time of the merger or consolidation. *Id.* § 17.01, 2003 Tex. Gen. Laws at 892–95 (codified at Tex. Civ. Prac. & Rem.Code Ann. §§ 149.001–.006 (West 2005)).

The Legislature also specified that the Statute would become "effective immediately" in all cases commenced on or after June 11, 2003, or in all pending cases in which trial, or any new trial or retrial after motion, appeal or otherwise, has not begun.[8] The Statute was the only section of House Bill 4 to be made immediately effective. *See id.* § 23.02(b), 2003 Tex. Gen. Laws at 898; H.J. of Tex., 78th Leg., R.S. 6041–042 (2003); S.J. of Tex., 78th Leg., R.S. 5008 (2003). The Statute was also the only section of House Bill 4 made retroactively applicable to all cases pending on its effective date. *See id.* § 17.02(2), 2003

---

ment in favor of Satterfield on the issue of successor liability, the Legislature changed the law, including the choice-of-law provision. Seizing upon the newly enacted law, Crown Cork moved for summary judgment and argued that Texas law applied.

5. Contrary to the dissent's assertions, Crown Cork conceded in its motion for summary judgment that, in the absence of the Statute, the "black letter rule in Texas has previously held a successor corporation liable for the torts of a predecessor corporation with which it merged." Thus, Crown Cork did not challenge Satterfield's claim that Crown Cork was liable for the negligent acts of Mundet under a theory of successor liability until after the Legislature enacted the Statute.

6. Because Mundet sold its insulation division and the acquiring company assumed only those liabilities of the division arising after February 8, 1964, Mundet retained and Crown acquired all liabilities not assumed by the acquiring company—i.e., liabilities arising before February 8, 1964.

7. That the causes of action Braley asserted against Crown Cork accrued prior to the Statute's enactment is not in dispute.

8. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 17.02(2), 2003 Tex. Gen. Laws 847, 895; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 149.001 (West 2005) (referencing historical note that designates June 11, 2003, as Statute's effective date).

Tex. Gen. Laws at 895. Codified at Chapter 149 of the Texas Civil Practice & Remedies Code, the Statute is entitled "Limitations in Civil Actions of Liabilities Relating to Certain Mergers or Consolidations." *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 149.001–.006.[9] Because this suit was pending on June 11, 2003, and the trial had not started, the Statute applied to it.

The stated purpose of the Statute is to limit cumulative "successor asbestos-related liabilities"[10] in Texas. *Id.* §§ 149.001–.002. A successor corporation is liable for asbestos claims[11] only up to the total gross assets of the transferor corporation from whom it received the asbestos-related liabilities; total gross assets are determined as of the time of the merger or consolidation. *See id.* § 149.003(a); *see also id.* §§ 149.001(4) (defining "successor" as "a corporation that assumes or incurs, or has assumed or incurred, successor asbestos-related liabilities"); 149.001(5) (defining "transferor" as "a corporation from which successor asbestos-related liabilities are or were assumed or incurred").[12] A successor corporation is not responsible for successor asbestos-related liabilities that ex-

**9.** Similar legislation passed in Pennsylvania, *see* 15 Pa. Cons.Stat. Ann. § 1929.1 (West 2001), was declared unconstitutional by the Pennsylvania Supreme Court under the open-courts provision of the Pennsylvania Constitution. *See Ieropoli v. AC & S Corp.,* 577 Pa. 138, 842 A.2d 919, 930 (2004).

**10.** "Successor asbestos-related liabilities" is defined in the Statute as:

> any liabilities, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, that are related in any way to asbestos claims that were assumed or incurred by a corporation as a result of or in connection with a merger or consolidation, or the plan of merger or consolidation related to the merger or consolidation, with or into another corporation or that are related in any way to asbestos claims based on the exercise of control or the ownership of stock of the corporation before the merger or consolidation. The term includes liabilities that, after the time of the merger or consolidation for which the fair market value of total gross assets is determined under Section 149.004, were or are paid or otherwise discharged, or committed to be paid or otherwise discharged, by or on behalf of the corporation, or by a successor of the corporation, or by or on behalf of a transferor, in connection with settlements, judgments, or other discharges in this state or another jurisdiction.

> Tex. Civ. Prac. & Rem.Code Ann. § 149.001(3).

**11.** An "asbestos claim" is defined in the Statute as:

> any claim, wherever or whenever made, for damages, losses, indemnification, contribution, or other relief arising out of, based on, or in any way related to asbestos, including:
> (A) property damage caused by the installation, presence, or removal of asbestos;
> (B) the health effects of exposure to asbestos, including any claim for:
> (i) personal injury or death;
> (ii) mental or emotional injury;
> (iii) risk of disease or other injury; or
> (iv) the costs of medical monitoring or surveillance; and
> (C) any claim made by or on behalf of any person exposed to asbestos, or a representative, spouse, parent, child, or other relative of the person.

> *Id.* § 149.001(1).

**12.** The Statute provides that a corporation may establish the fair market value of total gross assets by any method reasonable under the circumstances, including (1) by reference to the going concern value of the assets or to the purchase price attributable to or paid for the assets in an arm's-length transaction; or (2) in the absence of other readily available information from which fair market value can be determined, by reference to the value of the assets recorded on a balance sheet. *Id.* § 149.004(a) (West 2005). The fair market value of total gross assets may not reflect a deduction for any liabilities arising from any asbestos claim. *See id.* § 149.004(d). The fair market value at the time of the merger or consolidation is then adjusted as provided for inflation. *See id.* § 149.005 (West 2005).

ceed this limitation. *Id.* § 149.003(a). The Statute also provides that, if a transferor corporation had assumed or incurred successor asbestos-related liabilities from a prior merger or consolidation with a transferor, then the fair market value of the total assets of the first transferor shall be used to determine the successor corporation's liability. *Id.* § 149.003(b).

The Statute also alters the choice-of-law analysis in successor-liability cases. Courts are required "to the fullest extent permissible" to apply Texas law to successor-related liabilities. *See id.* § 149.006 ("The courts in this state shall apply, to the fullest extent permissible under the United States Constitution, this state's substantive law, including the limitation under this chapter, to the issue of successor asbestos-related liabilities."). Thus, even though the parties had agreed that Texas law did not apply and that the claim would be governed by another state's law under choice-of-law principles, such as the common law "most significant relationship" test, section 149.006 mandates application of the Statute. *See American Home Assurance Co. v. Safway Steel Prods. Co.,* 743 S.W.2d 693, 697 (Tex.App.-Austin 1987, writ denied) (noting that courts do not resort to "most significant relationship" analysis when there is "a local statutory provision controlling the disposition of the choice of law question"); Restatement (Second) of Conflict of Laws § 6(1) & cmts. a, b (1971) (directing court, subject to constitutional restrictions, to follow statutory directive of its own state on choice of law).

### The Trial Court's Judgment

The next month—one year from his date of diagnosis—Braley died. The representative of his estate, Rosemarie Satterfield, was substituted as plaintiff.

Crown Cork then filed a motion for summary judgment, *see* Tex.R. Civ. P. 166a(c),

based on "a newly enacted Texas statute," arguing that asbestos-related liabilities in Texas imposed an "unfair financial burden" on Crown Cork and that because it had already paid successor asbestos claims in excess of the limit of liability under the new statute, it had no further liability in any asbestos case. The trial court granted the motion and severed Braley's claims against Crown Cork from those against the other defendants. This appeal followed.

### ANALYSIS

On appeal, Satterfield argues that the summary judgment granted in favor of Crown Cork is based on the retroactive application of an unconstitutional special law. In three issues, she contends that the trial court erred in granting Crown Cork's motion for summary judgment because (i) the Statute violates the Texas Constitution's prohibition on retroactive laws by depriving her of all remedy for an accrued and pending cause of action, thereby extinguishing a vested right; (ii) the Statute violates the Texas Constitution's prohibition on special laws because it grants special privileges to a particular class for the advancement of private, rather than public, interests; and (iii) Crown Cork failed to establish, as a matter of law, the elements of its newly created affirmative defense under the Statute and is therefore not entitled to summary judgment.

Crown Cork responds that (i) Satterfield has not defeated the presumption that chapter 149 is constitutional; (ii) Satterfield's "individual rights must yield to the State's valid exercise of police power in enacting legislation designed to protect innocent successor corporations" from bankruptcy; (iii) the Statute is not a special law because it includes a substantial class of corporations to which the Statute would

apply and the classifications within the Statute are reasonable; and (iv) it met its summary judgment burden by establishing each element of its affirmative defense accorded by the Statute.

### Standard of Review

Our review of the district court's decision to grant summary judgment is de novo. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex.2004). Summary judgment under rule 166a(c) is proper when a movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995). A defendant, as movant, can satisfy this burden if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action or if the evidence conclusively establishes all elements of an affirmative defense. *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 843 (Tex.2005); *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997). In deciding whether there is a disputed issue of material fact precluding summary judgment, we take evidence favorable to the nonmovant as true, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in the nonmovant's favor. *Shah v. Moss*, 67 S.W.3d 836, 842 (Tex.2001).

As the party seeking summary judgment below, Crown Cork had the burden of establishing each element of its statutory affirmative defense as a matter of law. *McIntyre v. Ramirez*, 109 S.W.3d 741, 748 (Tex.2003). Satterfield responded to Crown Cork's motion both by seeking to raise issues of material fact as to whether Crown Cork established all the elements of its statutory affirmative defense and by challenging the Statute on constitutional grounds. Because Satterfield's challenge to the Statute as an unconstitutional retroactive law is an as-applied challenge, she must demonstrate that the Statute is unconstitutional under article I, section 16 of the Texas Constitution as applied to Braley's claims, or that it is an unconstitutional special law under article III, section 56 of the constitution, or that she has raised a fact issue about whether Crown Cork has conclusively established its statutory affirmative defense. *See* Tex. Const. arts. I, § 16; III, § 56; *see also Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 n. 16, 520 (Tex.1995) (in "as applied" challenge, plaintiff must show that "statute, even though generally constitutional, operates unconstitutionally as to him or her because of the plaintiff's particular circumstances").

### Does the Statute Violate the Texas Constitution's Prohibition on Retroactive Laws?

The Legislature may not make a law prohibited by the constitution of the state or that of the United States. *See, e.g., Shepherd v. San Jacinto Junior Coll. Dist.*, 363 S.W.2d 742, 743 (Tex.1962); *State v. Brownson*, 94 Tex. 436, 61 S.W. 114, 114 (1901). And the courts may not question the wisdom of a constitutional provision. *Cramer v. Sheppard*, 140 Tex. 271, 167 S.W.2d 147, 154 (1942).

**1. The Texas Constitution expressly prohibits retroactive laws.**

In her first issue, Satterfield contends that the Statute violates article I, section 16 of the Texas Constitution prohibiting the enactment of retroactive laws. That section provides:

> No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made.

Tex. Const. art. I, § 16. Satterfield contends that section 16 bars retroactive legislation that extinguishes or "impairs vest-

ed rights acquired under existing law." *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002); *Ex parte Abell*, 613 S.W.2d 255, 260 (Tex.1981); *Bailey v. City of Austin*, 972 S.W.2d 180, 191 (Tex.App.-Austin 1998, pet. denied). She urges that an accrued and pending cause of action is a vested right that may not retroactively be eliminated. She asserts that her accrued common law claims for negligence and strict products liability were vested before the Statute became effective and, therefore, could not be extinguished by subsequently enacted legislation.[13]

■ We begin our analysis with the presumption that the Statute is constitutional and that the party challenging its constitutionality bears the burden of demonstrating that it fails to satisfy constitutional requirements. *See Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W.2d 931, 934 (Tex.1996); *Vinson v. Burgess*, 773 S.W.2d 263, 266 (Tex.1989). It does not follow, however, that what the Legislature can legislate prospectively, it can legislate retroactively. *See* Tex. Const. art. I, §§ 16, 29. That the Constitution has taken certain legislation out of the hands of the Legislature due to its retroactive effect is clear. *Id.* The issue, then, is the breadth of that constitutional prohibition.

■ "In considering this question, then, we must never forget, that it is a constitution we are expounding"[14]—here, the Texas Constitution. In construing the Texas Constitution,

> [W]e consider "the intent of the people who adopted it." In determining that intent, "the history of the times out of which it grew and to which it may be

rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished, are proper subjects of the inquiry." However, because of the difficulties inherent in determining the intent of voters over a century ago, we rely heavily on the literal text.

*Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex.1989) (citations omitted); *see also City of Sherman v. Henry*, 928 S.W.2d 464, 472 (Tex.1996); *Ex parte Tucci*, 859 S.W.2d 1, 18 (Tex.1993) (Phillips, C.J., concurring); *Davenport v. Garcia*, 834 S.W.2d 4, 19 (Tex.1992).

A "constitution" has been defined as a "charter of government deriving its whole authority from the governed." *Republican Party of Texas v. Dietz*, 940 S.W.2d 86, 91 (Tex.1997) (quoting Black's Law Dictionary 311 (6th ed.1990)). It is a compact between the government and the people in which the people delegate powers to the government and in which the powers of the government are prescribed. *Id.* (citing *The Origins of the American Constitution: A Documentary History* ix (Michael G. Kammen ed., 1986)). By design, the framers of the Texas Constitution determined the constitution was to be a compact between the government and its citizens. Tex. Const. art. I, § 2 ("All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit."); *Republican Party*, 940 S.W.2d at 91 n. 6.

■ The guiding principle of construing a constitution is to ascertain and give effect to the intent of the voters who adopted it. *Williams v. Castleman*, 112

---

**13.** Satterfield's challenge to the retroactive application of the Statute is an "as applied" challenge; she thus claims that the Statute, although it may be otherwise constitutional, operates unconstitutionally as to the circumstances of this case and Braley's common law tort claims.

**14.** *McCulloch v. Maryland*, 17 U.S. 316, 4 Wheat. 316, 407, 4 L.Ed. 579 (1819).

Tex. 193, 247 S.W. 263, 265 (1922); *Cox v. Robison,* 105 Tex. 426, 150 S.W. 1149, 1151 (1912). The provisions of the Texas Constitution mean what they meant when they were promulgated and adopted, "and it does not lie within the power of the Legislature to change their meaning, or to enact laws in conflict therewith." *Jones v. Ross,* 141 Tex. 415, 173 S.W.2d 1022, 1024 (1943); *see also Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007, 1011–12 (1934) (meaning of constitution does not change with circumstances to make a different rule in a case seem desirable). As the supreme court stated more recently, "In interpreting the Texas Constitution, Texas courts rely heavily on the literal text and are to give effect to its plain language." *Republican Party,* 940 S.W.2d at 89; *see also City of Beaumont v. Bouillion,* 896 S.W.2d 143, 148 (Tex.1995).

 In a time contemporaneous with the drafting of our constitution, the Texas Supreme Court wrote:

> In the construction of a Constitution, it is to be presumed that the language in which it is written was carefully selected and made to express the will of the people, and that in adopting it they intended to give effect to every one of its provisions.

*Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 252 (1887). Like the citizens of other states, citizens of this State adopted state constitutions to restrict governmental power and guarantee individual rights. *See, e.g., LeCroy v. Hanlon,* 713 S.W.2d 335, 339 (Tex.1986). Adopted in a wholly different historical and conceptual framework than the federal constitution, the Texas Constitution exemplifies a desire to restrict governmental powers. *See id.; see also* Tex. Const. art. I, § 29. This Court has "regarded as axiomatic" that "a state constitution is in no manner a grant of power," but instead, operates solely as a limitation of power. *Watts v. Mann,* 187 S.W.2d 917, 923 (Tex.Civ.App.-Austin 1945, writ ref'd); *see also Shepherd,* 363 S.W.2d at 743. All power which is not limited by the constitution inheres in the people, and a legislative act is valid only when the constitution contains no prohibition against it. *Watts,* 187 S.W.2d at 923.

 In recent years, a strong resurgence of state constitutional analysis compels us to undertake an analysis of the Texas Constitution each time a provision of that fundamental document is implicated. Our high courts have increasingly looked to the Texas Constitution and particularly its bill of rights to determine its citizens' rights and liberties. While state constitutions cannot subtract from the rights guaranteed by the United States Constitution, state constitutions can, and often do, provide additional rights for their citizens. *See, e.g., Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *LeCroy,* 713 S.W.2d at 338. We may not allow a statutory provision not within the Legislature's province to override a state constitutional provision or allow the constitutional provision to become meaningless surplusage. We have long recognized the importance of state constitutions in protecting individual rights. When the Legislature has done that which the Bill of Rights forbids, then it becomes the duty of the judiciary to declare such enactments null and void. *See, e.g., Bronson v. Kinzie,* 42 U.S. 311, 1 How. 311, 11 L.Ed. 143 (1843); *Sturges v. Crowninshield,* 17 U.S. 122, 4 Wheat. 122, 4 L.Ed. 529 (1819). Our duty, then, is to examine the words of the constitution to determine whether a reason exists to defeat the statute's presumption of validity. *See Cox,* 150 S.W. at 1151.

Along with its unique history and "independent vitality," *see LeCroy,* 713 S.W.2d at 339, the Texas Constitution contains

singular provisions—sections 16 and 29 of article I—both found in its bill of rights. Tex. Const. art I, §§ 16, 29.

## A. Article I, Section 16

Unlike the United States Constitution, the Texas Constitution has a specific prohibition against retroactive laws. *Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648 (Tex.1971). This prohibition is found in the Texas Bill of Rights. *See* Tex. Const. art. I, § 16. Bills of right are often included as part of the compact between governments and citizens and are intended to protect citizens from governmental transgressions of certain fundamental rights. *Republican Party*, 940 S.W.2d at 91 (citing Thomas M. Cooley, LL.D., *A Treatise on the Constitutional Limitations which Rest Upon the Legislative Power of the States of the American Union* 176 (1868); 1 George D. Braden et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 2–3 (1977)). Significantly, the Texas Bill of Rights appears in article I of the Texas Constitution. Tex. Const. art. I. When the authors of the 1876 Constitution recommended its ratification, they assured citizens that each citizen's liberty would be protected by every safeguard known to constitutional law, and that the government of the state was restored to its people.

Some state constitutions and bills of rights provisions confer guarantees more extensive than those in the federal constitution. *Compare* U.S. Const. art. I, § 9, cl. 3 (prohibiting Congress from passing a bill of attainder or ex post facto law) *and id.* art. I, § 10 (prohibiting the states from enacting bills of attainder, ex post facto laws, or laws impairing the obligation of contracts) *with* Tex. Const. art. I, § 16 (prohibiting bills of attainder, ex post facto law, any law impairing the obligation of contracts *as well as retroactive laws*); [15] *see also Mellinger*, 3 S.W. at 252 (article I, section 16 of Texas Constitution gives protection the U.S. Constitution does not). The Texas Constitution has long been recognized "to possess independent vitality, separate and apart from the guarantees provided by the United States Constitution." *City of Sherman*, 928 S.W.2d at 473; *In the Interest of J.W.T.*, 872 S.W.2d 189, 197 (Tex.1994); *LeCroy*, 713 S.W.2d at 339. Thus, it is no surprise that the Texas Supreme Court concluded long ago that article I, section 16 of the Texas Constitution gives additional protection against retroactive lawmaking—in the form of an express bar on the passage of any "retroactive law"—not found in the U.S. Constitution. *See Mellinger*, 3 S.W. at 252. In the face of this express constitutional prohibition, little if any presumption of constitutionality remains. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (recognizing that scope of constitutional presumption is much narrower when legislation appears on its face to fall within express constitutional prohibition).

In shielding individual rights from the arbitrary enactment of retroactive laws, the supreme court in *Mellinger* honed in on the literal—and "plain"—language of the provision at issue:

> In the construction of a Constitution, it is to be presumed that the language in which it is written was carefully selected and made to express the will of the people, and that in adopting it they intended to give effect to every one of its

---

**15.** The United States Constitution expresses concern with retroactive laws through several of its provisions, including the ex post facto and takings clauses. *See Eastern Enters. v.* *Apfel*, 524 U.S. 498, 533, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998); *Landgraf v. USI Film Products*, 511 U.S. 244, 266, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

provisions; and it can not be presumed that separate and distinct provisions were intended to have the same and no other effect than one of them has, unless the language used, when considered in connection with the whole instrument, shows that this must have been the intention.

It can not be presumed that in adopting a Constitution which contained a declaration "that no retroactive law shall be made," that it was intended to protect thereby only such rights as were protected by other declarations of the Constitution which forbade the making of ex post facto laws, laws impairing the obligation of contracts, or laws which would deprive a citizen of life, liberty, property, privileges or immunities, otherwise than by due course of the law of the land.

The character of laws which, within the meaning of the Constitution, would operate as ex post facto laws, and laws impairing the obligations of contracts, were well understood, not only from the language descriptive of them used in the Constitution, but from adjudications made by the highest courts in the land, prior to the time the Constitution was adopted; *and there can be no doubt that by the clause in the Constitution which forbids the making of retroactive laws it was intended to give protection to every citizen against the arbitrary exercise of some power not forbidden by the other clauses of the Constitution referred to, which might be lawfully exercised but for this prohibition.*

3 S.W. at 252 (emphasis added).

 Retroactive legislation presents problems of unfairness not posed by prospective legislation "because it can deprive citizens of legitimate expectations and upset settled transactions." *General Motors Corp. v. Romein,* 503 U.S. 181, 191,

112 S.Ct. 1105, 117 L.Ed.2d 328 (1992); *see also Owens Corning v. Carter,* 997 S.W.2d 560, 572–73 (Tex.1999) (constitutional prohibition against retroactive laws derives from concepts of fair notice and well-settled expectations). Retroactivity is generally disfavored in the law, *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), in accordance with "fundamental notions of justice" that have been recognized throughout history, *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring). In his *Commentaries on the Constitution,* Justice Story reasoned, "[R]etrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact." 2 J. Story, *Commentaries on the Constitution* § 1398 (5th ed. 1891). A law that is fundamentally unfair because of its retroactivity is a law which is basically arbitrary. *See, e.g., Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 728–30, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984).

### B. Article I, Section 29

 In addition to section 16, which expressly bars the enactment of retroactive laws, article I of the Texas Constitution contains a specific provision in section 29 "that defines the scope and application of the Texas Bill of Rights." *Republican Party,* 940 S.W.2d at 89. Section 29 is titled "Provisions of Bill of Rights Excepted From Powers of Government; To Forever Remain Inviolate." It does not have a counterpart in the federal constitution. Not addressed by Crown Cork and rendered meaningless by the dissent, section 29 provides:

Sec. 29. To guard against transgressions of the high powers herein delegated, we declare that everything in this

"Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

Tex. Const. art. I, § 29. Contained in every constitution of the State of Texas, section 29 must be read as an express limitation on state power beyond that set forth in each of the individual rights guaranteed in the Texas Bill of Rights. *See* Tex. Const. of 1869, art. I, § 23; Tex. Const. of 1866, art. I, § 21; Tex. Const. of 1861, art. I, § 21; Tex. Const. of 1845, art. I, § 21. The first clause of section 29 establishes that the purpose of the Texas Bill of Rights is to "guard against transgressions of the high powers" delegated to the state government by the Texas Constitution. Its provisions excepting each right in the Bill of Rights "out of the general powers of government" and providing that "all laws" contrary to the Bill of Rights serve as a shield against the powers and laws of government. *See Republican Party,* 940 S.W.2d at 89–90; *see also* 1 Braden et al., *The Constitution of the State of Texas, supra,* 85–86. If it is to have meaning, the language of section 29 can only be intended to strengthen—not limit—the other provisions of the Bill of Rights. In this context, because the Texas Constitution circumscribes the limits of legitimate legislative action, it provides Texas citizens greater protection than that found in the federal constitution.

Under the plain and literal reading of the constitutional text, then, "retroactive laws" shall not be made, and the people of Texas have expressly withheld, "excepted out," and not given the Legislature *any* power to enact retroactive laws. *See* Tex. Const. art. I, §§ 16, 29. Contrary to the dissent's suggestion that section 29 is without meaning, Texas courts have attributed significance to this provision when addressed. *See Republican Party,* 940 S.W.2d at 89–90 (stating that article I, section 29 of the Texas Constitution expressly limits the power of Texas government by excepting everything in the Bill of Rights out of the general powers of government); *City of Beaumont,* 896 S.W.2d at 148–49 (stating that the guarantees found in the Bill of Rights are excepted from the general powers of government and that the state has no power to act in a manner contrary to the Bill of Rights); *Travelers' Ins. Co.,* 76 S.W.2d at 1010–11 (holding that Texas Legislature has no police power to violate article I, section 16 of the Texas Constitution because section 29 emphatically and unambiguously excepts this power from the powers of the government of the State of Texas).[16] By its language in *Mellinger,* the supreme court focused on the importance of the prohibition of retroactive laws, as well as giving meaning to each and every provision of the Bill of Rights, including the plain language of section 29. *Mellinger,* 3 S.W. at 252. Indeed, the supreme court has consistently held that courts "should avoid constructions that would render any constitutional provision meaningless or nugatory." *See, e.g., Spradlin v. Jim Walter Homes, Inc.,* 34 S.W.3d 578, 580 (Tex.

---

**16.** *See also Henderson v. Love,* 181 S.W.3d 810, 815 (Tex.App.-Texarkana 2005, no pet.) (finding that article I, section 29 "expressly limits the state's police power"); *Fazekas v. University of Houston,* 565 S.W.2d 299, 305 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.) (stating that, although state has broad police power, the Texas Constitution excepts from this power the authority to enact laws contrary to article I, section 16); *Faulk v. Buena Vista Burial Park Ass'n,* 152 S.W.2d 891, 893–94 (Tex.Civ.App.-El Paso 1941, no writ) (holding police power is restricted by constitutional bill of rights); *Murphy v. Phillips,* 63 S.W.2d 404 (Tex.Civ.App.-San Antonio, 1933, app. dism'd) (police power and resulting civil moratorium statute cannot violate constitutional rights).

2000); *Hanson v. Jordan,* 145 Tex. 320, 198 S.W.2d 262, 263 (1946).

■ Thus, the people of the State of Texas, in plain language set forth in article I, section 29 of the Texas Constitution, have expressly withheld from the Legislature the authority to enact retroactive laws in violation of article I, section 16.

■ But we acknowledge that a statute operating retrospectively alone is insufficient to invalidate a law. *Texas Water Rights Comm'n,* 464 S.W.2d at 648. Merely because a statute allows consideration of events that occurred prior to its enactment does not compel its invalidation, so long as the affected parties were given a reasonable opportunity to protect their interests. *Id.* It is a well-settled principle in Texas law that retroactive laws are unconstitutional only when they impair or destroy vested rights. *See id.; see also City of Tyler v. Likes,* 962 S.W.2d 489, 502 (Tex.1997); *McCain v. Yost,* 155 Tex. 174, 284 S.W.2d 898, 900 (1955); *Mellinger,* 3 S.W. at 249. The parties do not dispute that the Statute operates retroactively. Therefore, to determine whether the Statute is an unconstitutional retroactive law, we must consider whether the Statute impairs or destroys Satterfield's vested rights.

**2. The Statute is an unconstitutional retroactive law because it impairs Satterfield's vested rights and provides no grace period to preserve those rights.**

■ Crown Cork argues that Satterfield failed to demonstrate that the Statute impairs a vested right and that Satterfield's claim is a statutorily created remedy which may be repealed and is not subject to the prohibition against retroactive lawmaking. Citing *Aetna Ins. Co. v. Richardelle,* 528 S.W.2d 280 (Tex.Civ.App.-Corpus Christi 1975, writ ref'd n.r.e.) and *Dickson v. Navarro County Levee Improvement Dist. No. 3,* 135 Tex. 95, 139 S.W.2d 257 (1940), Crown Cork urges that Satterfield did not have a vested right because no final judgment had been rendered prior to the passage of the Statute.

■ The definition of a "vested right" differs from state to state and varies widely even within a state according to its context. Thus, we agree with Crown Cork's general assertions that litigants have no vested rights in new rules of law, a mere expectancy based upon the anticipated continuation of an existing law, or mere remedies. *See City of Dallas v. Trammell,* 129 Tex. 150, 101 S.W.2d 1009, 1014 (1937). Although Texas courts are split on whether an accrued and pending cause of action is a vested right, all but one of those courts that have analyzed state law, including relevant provisions of the Texas Constitution, have answered that question in the affirmative. *See, e.g., Likes,* 962 S.W.2d at 502 (finding common law cause of action against municipality for negligence was vested right); *Mellinger,* 3 S.W. at 253 (defining vested right as "well-founded claim" deserving of constitutional protection); *Price Pfister, Inc. v. Moore & Kimmey, Inc.,* 48 S.W.3d 341, 354 (Tex. App.-Houston [14th Dist.] 2001, pet. denied) (quoting *Mellinger,* 3 S.W. at 253, and defining vested rights as a state of facts, which in the course of time or under given circumstances, becomes fixed or vested by operation of existing law).[17] Un-

---

**17.** *But see Robinson v. Crown Cork & Seal Co.,* 251 S.W.3d 520 (Tex.App.-Houston [14th Dist.] 2006, pet. filed). While we recognize that our sister court has reached the opposite conclusion in a case involving similar facts, we are not bound to follow the decision of another court of appeals. *See Delamora v. State,* 128 S.W.3d 344, 359 (Tex.App.-Austin 2004, pet. ref'd); *see also Shook v. State,* 156 Tex.Crim. 515, 244 S.W.2d 220, 221 (1951)

207

der general principles of tort law, a personal injury cause of action—like the causes of action asserted by Satterfield here—accrues when conduct that invades the rights of another has caused injury. *See* Restatement (Second) of Torts §§ 899, 910 (1977). When the injury occurs, the injured party has the right to bring suit for all of the damages, past, present, and future, caused by the defendant's acts. *See id.* The facts and circumstances surrounding Braley's injuries and death occurred well before the Statute was enacted, and Braley had already filed suit on his claims by the date on which the Statute became effective. Thus, Satterfield's cause of action was accrued and pending, or vested, prior to the effective date of the Statute.

Accepting Crown Cork's argument that a right does not become vested unless a final judgment has been rendered, the dissent ignores the significance of these events. But contrary to this argument, neither the Texas Constitution nor the Texas Supreme Court defines a vested right in terms of a final judgment. In *Mellinger,* the supreme court recognized accrued causes of action as a vested right protected by article I, section 16:

> [Article I, section 16] evidences an intention to place a further restriction on the power of the Legislature, and it must be held to protect every right, even though not strictly a right to property, which may accrue under existing laws prior to the passage of any act which, if permitted a retroactive effect, would take away the right. A right has been well defined to be a well founded claim, and a well founded claim means nothing more nor less than a claim recognized or secured by law....

[I]t must necessarily be held that a right, in a legal sense, exists, when in consequence of given facts the law declares that one person is entitled to enforce against another a claim, or to resist the enforcement of a claim urged by another.

\* \* \*

When ... such a state of facts exists as the law declares shall entitle a plaintiff to relief in a court of justice on a claim which he makes against another, or as it declares shall operate in favor of a defendant as a defense against a claim made against him, then it must be said that a right exists, has become fixed or vested, and is beyond the reach of retroactive legislation, if there be a constitutional prohibition of such laws. This, so far as we have been able to ascertain, has been the ruling in every State in this Union which has a constitutional provision in terms forbidding retroactive laws in which any ruling upon the question has been made.

3 S.W. at 253; *see also Likes,* 962 S.W.2d at 502; *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556, 560 (1916). Other Texas courts have embraced the definition of vested right as a well-founded claim as set forth in *Mellinger. See, e.g., Texas Water Rights Comm'n,* 464 S.W.2d at 648; *Middleton,* 185 S.W. at 560. To be entitled to constitutional protection, however, the supreme court has emphasized that a cause of action must be both accrued *and pending. See, e.g., Likes,* 962 S.W.2d at 502 (denying as applied challenge on retroactivity grounds to amended statute, which shortened limitations period, where suit was not filed until after the amended statute became effective). Thus,

(court not bound to follow a decision of a court of equal jurisdiction); *Lambert v. Affiliated Foods, Inc.,* 20 S.W.3d 1, 8 (Tex.App.-Amarillo 1999), *aff'd sub nom. Lawrence v. C.D.B. Services Inc.,* 44 S.W.3d 544 (Tex. 2001).

the Legislature may not retroactively extinguish or eliminate accrued and pending causes of action, either by procedural changes such as shortening statutes of limitation, or by substantive changes, such as creating new affirmative defenses. *See, e.g., DeCordova v. City of Galveston,* 4 Tex. 470, 480 (Tex.1849) ("[I]f a statute of limitations applied to existing causes barred all remedy or did not afford a reasonable period for their prosecution ... such legislation would be retrospective within the intent of the prohibition, and would therefore be wholly inoperative."); *Johns–Manville Sales Corp. v. R.J. Reagan Co.,* 577 S.W.2d 341, 345–46 (Tex.Civ. App.-Waco 1979, writ ref'd n.r.e.) (holding that defendant could not assert statutory affirmative defense enacted three years after claim accrued because such would affect "vested rights and substantive law").

■ The dissent argues that the Statute does not impair vested rights because it merely changes the choice of law provision regarding successor liability and that Satterfield has no vested right in a remedy or a statutory choice of law provision. But the dissent's argument misses the point. In its motion for summary judgment, Crown Cork conceded that "the black letter rule in Texas" provided for successor liability. In its motion for summary judgment, Crown Cork stated that "the black letter rule in Texas has previously held a successor corporation liable for the torts of a predecessor corporation with which it merged" and "[u]ntil recently, it has been the black letter rule in Texas ... and elsewhere ... that when a predecessor

corporation merges with a successor corporation, the successor can be held liable for the torts of the dissolved predecessor." Thus, Crown Cork did not raise the arguments that the Statute does not impair vested rights because it merely changes the choice of law provision or that Satterfield has no vested right in a remedy or statutory choice of law provision in its motion for summary judgment.[18] Accordingly, the trial court could not have granted—and we cannot affirm—summary judgment on the ground now urged by the dissent. *See Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993); *see also* Tex.R. Civ. P. 166a(c) ("The motion for summary judgment shall state the specific grounds therefor.").

■ Moreover, the dissent is incorrect in its assertion that Satterfield has no vested right in a remedy. Texas courts have long recognized that laws affecting a remedy can be unconstitutionally retroactive when the entire remedy is taken away. *See Likes,* 962 S.W.2d at 502; *De Cordova,* 4 Tex. at 480. Like a statute of limitations, the Statute affects Satterfield's remedy because it removes entirely all remedy against Crown Cork. While the Legislature can affect a remedy by providing shorter limitations for an accrued cause of action without violating the constitutional prohibition against retroactivity if it affords plaintiffs a reasonable time in which to preserve their vested rights or if the amendment does not bar all remedy, *see Likes,* 962 S.W.2d at 502, it has not done so here.[19] Under the express terms of the

---

18. The dissent reasons that Crown Cork raised the issue in its reply. But Crown Cork may not use its reply to assert new grounds for summary judgment. *See* Tex.R. Civ. P. 166a(c); *see also Sanders v. Capitol Area Council,* 930 S.W.2d 905, 911 (Tex.App.-Austin 1996, no writ) (holding movant may not raise new grounds for summary judgment in

reply to nonmovant's response); *Sams v. N.L. Indus., Inc.,* 735 S.W.2d 486, 488 (Tex.App.-Houston [1st Dist.] 1987, no writ) (same).

19. Other states, including Florida, Georgia, Mississippi, Ohio, Pennsylvania and South Carolina have enacted similar legislation. But, in all of these states, courts have struck down the legislation to the extent it applies

Statute, Satterfield has no available remedy against Crown Cork. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 149.001–.006.

Texas courts have recognized that a cure for retroactivity is to allow statutes to operate prospectively or for the Legislature to provide a grace period when enacting statutes affecting vested rights. *See, e.g., Likes,* 962 S.W.2d at 502 (upholding retroactive application of new immunity defense when the Legislature afforded a reasonable time to file accrued causes of action); *Texas Water Rights Comm'n,* 464 S.W.2d at 649 (permittee afforded a reasonable time after enactment of statute to preserve their rights, thus providing a "reasonable remedy" after fair opportunity to protect rights); *Middleton,* 185 S.W. at 560 (recognizing that new law did not apply to claims that accrued prior to enactment).

In *Middleton,* the Texas Supreme Court upheld the constitutionality of the first worker's compensation law. 185 S.W. at 562. Acknowledging that the Legislature did not make the new law applicable to personal injury claims that had accrued before the act's passage, the supreme court explained, "A *vested* right of action given by the principles of the common law is a property right, and is protected by the Constitution as is other property. The Act, however, does not profess to deal with rights of actions accruing before its passage.... The laws may be changed by the Legislature so long as they do not destroy or prevent adequate enforcement of vested rights." *Id.* at 560.

Likewise, in rejecting an argument that an amendment providing additional bases for immunity under the Tort Claims Act unconstitutionally deprived a plaintiff of her vested rights, the supreme court em-

---

retroactively, or such legislation has expressly provided that it applies only prospectively to cases filed on or after the effective date of the legislation. Most recently, a Florida court of appeals held that the Florida legislation could not be retroactively applied to divest plaintiffs of their accrued causes of action, which were vested rights under Florida law. *See Williams v. American Optical Corp.,* 985 So.2d 23, 26–28, 33 (Fla.Dist.Ct.App.2008). In 2006, the Ohio court of appeals determined that the Ohio legislation was unconstitutionally retroactive when applied to cases pending before the legislation's effective date. *See Ackison v. Anchor Packing Co.,* Lawrence No. 05CA46, 2006 WL 3861073, at *9, 2006 Ohio App. LEXIS 7047, at *26–27 (Ohio Ct.App. 2006), *review granted,* 113 Ohio St.3d 1465, 864 N.E.2d 652 (2007); *Wagner v. Anchor Packing Co.,* Lawrence No. 05CA47, 2006 WL 3861077, at *4, 2006 Ohio App. LEXIS 7050, at *11–12 (Ohio Ct.App.2006) (same, but noting that legislation itself is not unconstitutionally retroactive because it gives courts discretion to decide on a case-by-case basis whether application to claims pending prior to the statute's effective date would be unconstitutionally retroactive); *cf. Wilson v. AC & S, Inc.,* 169 Ohio App.3d 720, 864 N.E.2d 682, 695 (2006) (holding, under facts presented,

that new statute could be applied to plaintiff's case because she was still able to pursue cause of action for injury caused by husband's exposure to asbestos), *appeal dism'd,* 113 Ohio St.3d 1457, 864 N.E.2d 645 (2007) (dismissed on appellant's application). And in 2004, the Pennsylvania Supreme Court invalidated the Pennsylvania statute on retroactivity grounds under the open courts provision of the Pennsylvania Constitution. *See Ieropoli,* 842 A.2d at 919. In addition, the legislation enacted in Georgia, Mississippi, and South Carolina expressly provides that such legislation applies only prospectively to cases filed after the statute's effective date. *See* Ga. S.B. 182, § 4, 2007 Ga. ALS 9 ("[Chapter 15] shall become effective on May 1, 2007, and shall apply to asbestos claims that accrued or may accrue on or after that date"); S.C. S.B. 1163, § 4, 2006 S.C. Acts 280 ("This act takes effect upon approval by the Governor and applies to all civil actions asserting an asbestos claim filed on or after that date."); Miss. H.B. 1517, § 10, 2004 Miss. Laws 353 ("This Act shall take effect and be in force from and after its passage."). Thus, Texas is the only remaining state in which this type of legislation has been applied retroactively to bar accrued and pending causes of action and has not been struck down as unconstitutional.

phasized that the amendment was constitutional because the Legislature afforded a grace period: "The Legislature can affect a remedy ... for an accrued cause of action without violating the retroactivity provision of the Constitution if it affords a reasonable time or fair opportunity to preserve a claimant's rights under the former law, or if the amendment does not bar all remedy." *Likes*, 962 S.W.2d at 502. The *Mellinger* court also recognized that if a provision regulating a remedy should be "so unreasonable as to amount to a denial of right, as for instance, if a statute of limitations applied to existing causes barred all remedy, or did not afford a reasonable period for their prosecution ... such legislation would be retrospective within the intent of the prohibition, and would therefore be wholly inoperative." 3 S.W. at 254–55.

Here, the Statute affords no grace period. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 149.001–.006. It was effective immediately, *see* Act of June 2, 2003, *supra*, § 23.02(b), 2003 Tex. Gen. Laws at 898, and it applied to all pending causes of action. *See id.* § 17.02(2), 2003 Tex. Gen. Laws at 895. In fact, the Statute was the only provision in House Bill 4, which completely re-wrote Texas law on class actions and medical malpractice claims, made applicable to pending causes of action. *See id.* The majority of House Bill 4 did not apply to *pending* cases, but applied only to those cases filed after its general effective date—September 1, 2003.[20] *Id.* § 23.02(d), 2003 Tex. Gen. Laws at 899.

■ Even if one accepts the dissent's view that the Statute is remedial in the sense that it merely deprives Satterfield of a remedy for her accrued and pending claims against Crown Cork, the Statute would still be unconstitutional because it applies retroactively and fails to provide Satterfield, and other potential claimants, a reasonable time to bring suit after the enactment of the new law and preserve their vested rights. *See Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex.1999) (holding that procedural or remedial statutes may not be applied to pending suits at the time they become effective if doing so would destroy or impair rights that vested before the statute's effective date); *Mellinger*, 3 S.W. at 254–55 (same); *see also In re K.N.P.*, 179 S.W.3d 717, 720–21 (Tex.App.-Fort Worth 2005, pet. denied) (finding statute of limitations cannot be retroactively applied because "the statute did not provide a reasonable time for appellants to bring suit after enactment of the new law"); *Commercial Ins. Co. of Newark v. Lane*, 480 S.W.2d 781, 783 (Tex.Civ.App.-Dallas 1972, writ ref'd n.r.e.) (explaining that a procedural or remedial statute is unconstitutional if it "destroys or impairs vested rights, or takes away a litigant's remedy or right of action, or of defense, or so unreasonably encumbers or limits it as to render [it] useless or impracticable"). The Texas Supreme Court has consistently held that even procedural or remedial statutes cannot be applied retroactively where doing so would destroy or impair vested rights. *See Baker Hughes*, 12 S.W.3d at 4; *Owens Corning*, 997 S.W.2d at 572–73; *Likes*, 962 S.W.2d at 502. The Legislature may regulate or even abolish common law claims like those asserted by Satterfield, but it cannot do so without granting some protection to vested rights and well-settled expectations by affording "a reasonable time or fair opportunity to preserve a claimant's rights under the former law."

20. Articles 4, 5, and 8 of H.B. 4 were made applicable to an action filed on or after July 1, 2003. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 23.02(c), 2003 Tex. Gen. Laws 847, 899.

See, e.g., Owens Corning, 997 S.W.2d at 572–73; Likes, 962 S.W.2d at 502; see also Vaughn v. Fedders, 239 Fed.Appx. 27, 31 (5th Cir.2007) (applying Texas law and concluding that Texas Legislature cannot alter a remedy and "entirely deprive a party with an accrued cause of action of the right to sue, and must afford that party a reasonable time in which to bring suit" under former law); Burlington N. & Sante Fe Ry. v. Skinner Tank Co., 419 F.3d 355, 359–60 (5th Cir.2005) (same). The dissent's unsupported view that the Statute may be constitutionally applied retroactively in this case to bar Satterfield's accrued and pending claims against Crown Cork because the Statute is merely remedial is without merit.

Because Satterfield's common law claims of negligence and strict products liability accrued and were pending in the trial court when the Statute took effect, Satterfield held vested rights in those claims that could not be destroyed. See Likes, 962 S.W.2d at 502; Mellinger, 3 S.W. at 253; Price Pfister, Inc., 48 S.W.3d at 354. By enacting this expressly retroactive Statute, the Legislature created a new substantive defense to successor liability and made it immediately effective in all pending cases, destroying Satterfield's vested rights in her accrued and pending common law claims against Crown Cork. Without affording a reasonable grace period in which Satterfield could have preserved her rights, we conclude that the Statute as applied in this case operates as an unconstitutional retroactive law and, therefore, violates article I, section 16 of the Texas Constitution.

### 3. Ieropoli v. AC & S Corp.

In addressing the constitutionality of a similar Pennsylvania statute limiting the successor asbestos-related liabilities of cer-tain companies, the Pennsylvania Supreme Court in Ieropoli v. AC & S Corp., 577 Pa. 138, 842 A.2d 919 (2004), held the statute unconstitutional as applied under the Pennsylvania Constitution. The Ieropoli court found that the statute eliminated any remedy for an accrued cause of action and that an accrued cause of action is a vested right. Id. at 930–32. The court cited longstanding precedent that an accrued cause of action is a vested right, which legislation may not extinguish:

> "There is a vested right in an accrued cause of action. . . . A law can be repealed by the law giver; but the rights which have been acquired under it, while it was in force, do not thereby cease. It would be an absolute injustice to abolish with the law all the effects it had produced. This is a principle of general jurisprudence; but a right to be within its protection must be a vested right."

Id. at 927 (quoting Lewis v. Pennsylvania R. Co., 220 Pa. 317, 69 A. 821, 823 (1908)). Finding the statute to be a violation of the state's constitution as applied, the Ieropoli court concluded that the plaintiff's vested rights could not be extinguished by subsequent legislation and that, by doing so, the statute offended the state constitution's open courts provision. Id. at 930–32.

Insisting that the police power overrides the Texas Constitution's prohibition of retroactive laws to distinguish this case from Ieropoli, Crown Cork urges that the Pennsylvania court's analysis is flawed because it "contained no analysis regarding whether a statute that may have impaired a vested right could nevertheless be constitutional because it was a legitimate exercise of the legislature's police power." Although Ieropoli involved the open courts provision of the Pennsylvania Constitution[21] and a variation of the Texas asbes-

---

21. The Texas Constitution also has an open courts provision, providing that "[a]ll courts

tos statute, in holding the Pennsylvania statute to be unconstitutional as applied, the court's reasoning is instructive here.[22] Reversing the lower court, the Pennsylvania Supreme Court concluded that the statute violated the open courts provision of the Pennsylvania Constitution by destroying all remedy for an accrued action. *Id.* at 932. The court further held that an accrued claim is a vested right that cannot be eliminated by subsequent legislation. *Id.* at 927. In explaining why the statute violated the remedies clause of the Pennsylvania Constitution, the court stated:

> Before the Statute's enactment, each cause of action that Appellants brought against Crown Cork was a remedy—it was the vehicle by which Appellants lawfully pursued redress, in the form of damages, from Crown Cork for an alleged legal injury. But under the Statute, Appellants cannot obligate Crown Cork to pay them damages on those causes of action. In this way, each cause of action has been stripped of its remedial significance, as it can no longer function as the means by which Appellants may secure redress from Crown Cork. As a remedy, each cause of action has been, in essence, extinguished. Under [the open courts provision of the Pennsylvania Constitution], however, a statute may not extinguish a cause of action that has accrued.... Therefore, as Appellants' causes of action accrued before the Statute was enacted, we hold that the Statute's application to Appellants' causes of action is unconstitutional....

*Id.* at 930 (internal citation omitted). The court rejected the argument that because the plaintiffs could recover from other potential defendants, it still had a remedy and no cause of action had been extinguished. *Id.*

Crown Cork also asserts that the Statute passes constitutional muster because it does not deprive Satterfield of *all* remedy because she sued other defendants and can

shall be open, and every person for any injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Tex. Const. art. I, § 13. It requires that state law "must afford meaningful legal remedies to our citizens, so the Legislature may not abrogate the right to assert a well-established common law cause of action." *Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 410 (Tex.1997) (citing *Texas Ass'n of Bus. v. Air Control Bd.*, 852 S.W.2d 440, 448 (Tex. 1993), and *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 355–57 (Tex.1990)).

**22.** To the extent the dissent criticizes our discussion of the Pennsylvania Supreme Court's decision in *Ieropoli*, the dissent misses the mark. While we recognize that Satterfield does not raise an open courts challenge, the Pennsylvania Supreme Court's analysis of whether a similar statute passed by the Pennsylvania Legislature impaired vested rights and destroyed all remedy for an accrued cause of action applies with equal force in Texas given that Texas law has considered an accrued cause of action to be a vested right subject to constitutional protection for over one hundred years. *See City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex.1997); *Middleton v. Texas Power & Light Co.*, 108 Tex. 96, 185 S.W. 556, 560 (1916); *Mellinger v. City of Houston*, 68 Tex. 37, 3 S.W. 249, 253 (1887). Moreover, unlike the Texas Constitution, the Pennsylvania Constitution neither mandates nor prohibits the retroactive or prospective application of a new rule of law. *See Commonwealth v. Perez*, 577 Pa. 360, 845 A.2d 779, 790 (2004); *Blackwell v. State Ethics Comm'n*, 527 Pa. 172, 589 A.2d 1094, 1098 (1991) (explaining that, under Pennsylvania common law, a decision announcing a new rule of law was normally considered to be retroactive). Although the Pennsylvania Constitution does prohibit the enactment of ex post facto laws, the Pennsylvania Supreme Court has held that the prohibition against ex post facto laws applies only to criminal or penal statutes, and not to retroactive laws affecting civil matters. *See, e.g., Swartz v. Carlisle*, 237 Pa. 473, 85 A. 847, 849 (1912); *Grim v. Weissenberg Sch. Dist.*, 57 Pa. 433, 435 (Pa.1868).

satisfy her claims by obtaining a judgment against those defendants. Crown Cork suggests that the Statute merely *varies* the remedy available to Satterfield. Because some of the other defendants who were sued jointly and severally are "some of this country's largest and most successful businesses," Crown Cork argues that Satterfield may obtain a settlement from another defendant that will satisfy her judgment and, therefore, the Statute does not entirely take away her remedy or even "diminish her remedy in any way."

In rejecting the notion that the Pennsylvania statute was purely remedial and did not bar *all* remedy, the *Ieropoli* court reasoned:

> What this reasoning overlooks is the individual nature of a cause of action. A plaintiff does not assert one cause of action against multiple defendants. Rather, a plaintiff asserts one cause of action (or two or several causes of action) against a single defendant. While a plaintiff may, under the appropriate circumstances, join the cause of action he has against one defendant with the cause of action he has against another defendant in one lawsuit, the cause of action he asserts against each defendant remains distinct.... Thus, the fact that the causes of action Appellant brought against Crown Cork's co-defendants are proceeding has no bearing on the Statute's unconstitutional effect on the ac-

crued causes of action that Appellants brought against it.

*Id.* (internal citation omitted). Crown Cork cites no authority for the notion that the Texas Constitution allows a statute to retroactively destroy a vested right in an accrued claim if other parties may be liable on other claims seeking damages for the same injury.[23] The *Ieropoli* court observed that the Pennsylvania statute did more than simply alter the allocation of damages among multiple defendants: The Pennsylvania statute shielded Crown Cork from any obligation to pay damages on asbestos-related causes of action, and further removed it as a defendant. *See id.*

Although the Pennsylvania Constitution is different from the Texas Constitution, and the Pennsylvania court relied upon the open courts provision to uphold a challenge to the Pennsylvania statute,[24] both states use the vested-rights analysis and both constitutions—albeit under different provisions—prohibit statutes that retroactively eliminate accrued claims. While the Pennsylvania Constitution does not contain a prohibition against retroactive laws, the Texas Constitution contains an open courts provision as well as an express bar against retroactive laws in article I, section 16, and an express prohibition on legislating away the rights contained in the bill of rights in article I, section 29. Accordingly, even though the Pennsylvania court relied on the open courts provision of the Pennsylvania Constitution, its reasoning and anal-

---

**23.** To the extent that the dissent relies on the Fifth Circuit's decision in *Jones v. Pullman Kellogg Corp.*, 785 F.2d 1270 (5th Cir.1986), to support this proposition, the dissent's reliance is misplaced. Although the court in *Jones* found that a statute that eliminated Jones's medical malpractice claims against one defendant did not violate the open courts provision of the Texas Constitution because Jones's claims for damages against other defendants remained viable, the court in *Jones* did not consider whether such a law would violate the Texas Constitution's express prohi-

bition against retroactive laws in article I, section 16. *See id.* at 1272–73.

**24.** Although Crown Cork dismisses the relevance of the *Ieropoli* decision because it fails to address the state's police power, having found the Pennsylvania statute fatally flawed under the open-courts provision, the Pennsylvania court declined to address the remaining six theories of constitutional invalidity. *See Ieropoli*, 842 A.2d at 924 n. 7.

ysis regarding the prohibition against retroactive laws is persuasive in light of the Texas Constitution's explicit prohibition against retroactive laws.

### Does the Statute Fall Within the Scope of the State's Police Power and is it a Reasonable Exercise of the State's Police Power?

Crown Cork argues that "even if the Statute impairs a vested right or deprives appellant of all remedy," the Legislature "possesses the power to regulate corporations and weigh the hardship of individuals against the hardship placed upon all of Texas' citizens, both individual and corporate." Crown Cork urges that Satterfield "ignores Texas law dictating that her individual rights must yield to the State's valid exercise of police power in enacting legislation designed to protect innocent successor corporations from a bankruptcy that could affect thousands of Texas residents." We disagree.

 A statute enacted under the guise of police power that does not fall within the scope of that power and is not reasonably related to safeguarding the public's health, safety or welfare is an invalid exercise of that power. Because the people of Texas in plain language in the Texas Constitution have not delegated to their government the power to enact a retroactive law, the Legislature has no police power to override Satterfield's vested rights.[25]

 As we began our analysis with a presumption of constitutional validity, see Enron Corp., 922 S.W.2d at 934, and Vinson, 773 S.W.2d at 266, there is also a strong presumption of reasonableness and recognition that a "Legislature understands and correctly appreciates the needs

of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds." Smith v. Davis, 426 S.W.2d 827, 831 (Tex.1968). As a practical matter, if this were not the rule, legislative bodies would be without power to legislate in all cases involving police power where there was room for a difference of opinion as to the wisdom and necessity therefor, except subject to the approval of a jury. But it is the duty of the courts to determine, as a matter of law, whether the Legislature's exercise of the police power is reasonable. See Meyer v. Nebraska, 262 U.S. 390, 400, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385 (1894); Missouri, Kan. & Tex. R. Co. v. Rockwall County Levee Improvement Dist. No. 3, 117 Tex. 34, 297 S.W. 206, 212 (1927); Houston & Tex. Cent. R.R. Co. v. City of Dallas, 98 Tex. 396, 84 S.W. 648, 653–54 (1905); City of Coleman v. Rhone, 222 S.W.2d 646, 650 (Tex.Civ.App.-Eastland 1949, writ ref'd).

Facing claims that a statute unconstitutionally abrogated vested rights, some Texas courts have resolved the issue by addressing the Legislature's police power. See, e.g., Robinson, 251 S.W.3d at 526; Texas State Teachers Ass'n v. State, 711 S.W.2d 421, 424 (Tex.App.-Austin 1986, writ ref'd n.r.e.); Ismail v. Ismail, 702 S.W.2d 216, 222 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.); State Bd. of Registration for Prof'l Eng'rs v. Wichita Eng'g Co., 504 S.W.2d 606, 608 (Tex.Civ.App.-Fort Worth 1973, writ ref'd n.r.e); City of Breckenridge v. Cozart, 478 S.W.2d 162, 164 (Tex.Civ.App.-Eastland 1972, writ ref'd n.r.e.); Texas State Bd. of Barber Exam'rs v. Beaumont Barber College, 454

---

**25.** We observe that any inquiry into whether the Legislature reasonably exercised its police power to enact a retroactive law is largely academic because the Texas Legislature has no power, police or otherwise, to enact such a law at all. See Tex. Const. art. I, §§ 16, 29.

S.W.2d 729, 731–32 (Tex.1970); *City of Coleman,* 222 S.W.2d at 648–49. Likewise, the Texas Supreme Court relied on the police power to validate a statute addressing historic water use in *Barshop v. Medina County Underground Water Conservation District,* 925 S.W.2d 618, 633–34 (Tex. 1996).

■■■ Even if we were to apply the overlay of a police power analysis in the context of limiting corporate liability, the police power remains subject to the limitations imposed by the Constitution upon every power of government. *Travelers' Ins. Co.,* 76 S.W.2d at 1011 (recognizing that the police power is broad and comprehensive, but concluding that the Texas Constitution "forbids its exercise when the result would be the destruction of the rights, guarantees, privileges, and restraints excepted from the powers of government by the Bill of Right[s]"). For the police power to trump *any* constitutional provision is surely the most circular of arguments. "Emergency" does not *create* constitutional power; it may only furnish the occasion for the *exercise* of power. *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 426, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

■■■ Although the police power is broad, it is not without limits. *See Travelers' Ins. Co.,* 76 S.W.2d at 1011. It remains subject to the rule that the Legislature cannot exercise *any* power that is expressly or impliedly forbidden by the state constitution, and the Legislature, through its exercise of police power, may not render the constitution meaningless. *See id.* at 1010–11. Reviewing courts cannot sustain "[u]surpations of power, or the exercise of power in disregard of the express provision or plain intent of the constitution … in deference to the judgment of the Legislature, or some supposed necessity." 12A Tex. Jur.3d, *Constitutional Law* § 57 (1993) (citing *Travelers' Ins. Co.,* 76 S.W.2d at 1007). The mere assertion by the Legislature that a statute relates to the public health, safety, or welfare does not of itself bring such statute within the police power of a state. *Mugler v. Kansas,* 123 U.S. 623, 661, 8 S.Ct. 273, 31 L.Ed. 205 (1887) ("It does not at all follow that every statute enacted ostensibly for the promotion of these ends, is to be accepted as a legitimate exertion of the police powers of the State."); *see also* 16A Am.Jur.2d *Constitutional Law* § 335 (1998). The Legislature, in exercising its police power, "cannot, by its mere fiat," make reasonable that which is indisputably unreasonable, or unconstitutional. 16A Am.Jur.2d *Constitutional Law* § 335; *see also State v. Spartan's Indus. Inc.,* 447 S.W.2d 407, 417 (Tex.1969). This accountability for the constitution may lie in the first instance with the Legislature, but it runs inexorably to the judiciary.

■■■ For a statute to be a proper exercise of police power, it must (i) be appropriate and reasonably necessary to accomplish a purpose within the scope of the police power and (ii) be reasonable and not arbitrary or unjust in the manner it seeks to accomplish the goal of the statute or so unduly harsh that it is out of proportion to the end sought to be accomplished. *See, e.g., Mugler,* 123 U.S. at 661, 8 S.Ct. 273; *Martin v. Wholesome Dairy, Inc.,* 437 S.W.2d 586, 591 (Tex.Civ.App.-Austin 1969, writ ref'd n.r.e.); *City of Coleman,* 222 S.W.2d at 648–49.

In support of its claim that the Statute falls within the scope of the police power, Crown Cork cites cases that involve exercises of police power for public health and safety, including *Barshop* (upholding laws related to environmental protection and water conservation); *Texas State Teachers Association, State Board of Registration for Professional Engineers,* and *Texas*

*State Board of Barber Examiners* (regulation of professions); and *Caruthers* (zoning). With a mere nod to those cases analyzing the applicability of the police power, the supreme court in *Barshop* concluded that "[a] valid exercise of the police power by the Legislature to safeguard the public safety and welfare can prevail over a finding that a law is unconstitutionally retroactive." 925 S.W.2d at 633–34 (citing *Texas State Teachers Ass'n*, 711 S.W.2d at 424; *State Bd. of Registration for Prof'l Eng'rs*, 504 S.W.2d at 608; *Texas State Bd. of Barber Exam'rs*, 454 S.W.2d at 732; and *Caruthers*, 290 S.W.2d at 345). *Barshop* is simply not relevant here. The supreme court in *Barshop* considered whether the Edwards Aquifer Act was constitutional *on its face.* 925 S.W.2d at 633 (plaintiffs argued that the Act was an unconstitutional retroactive law because "the amount of water a landowner is allowed to withdraw is determined from action or inaction taken before the passage, signing, or effective date of the Act"). *Barshop* did not involve accrued and pending causes of action but addressed whether a landowner has vested property rights to water beneath his land. *Id.* at 630. The

supreme court did not have occasion to address article I, section 29, in part because the court "assum[ed] without deciding that Plaintiffs possess[ed] a vested property right." *Id.* While we agree with Crown Cork that these particular cases, including *Barshop,* may have involved a valid exercise of police power, the question whether the Statute in this case is a valid exercise of police power remains subject to review by this Court.[26] *See Lawton,* 152 U.S. at 137, 14 S.Ct. 499; *Missouri, Kan. & Tex. R. Co.,* 297 S.W. at 212.

■ In determining whether an exercise of police power is proper, we ask if the statute in question bears a real and substantial relation to the public health, safety, morals, or general welfare *of the public. See Barbier v. Connolly,* 113 U.S. 27, 31, 5 S.Ct. 357, 28 L.Ed. 923 (1885) (legislation must carry out a "public purpose" and promote "the general good"); *see also Lombardo v. City of Dallas,* 124 Tex. 1, 73 S.W.2d 475, 478 (1934) (only *public* necessity can justify exercise of police power); *Jefco, Inc. v. Lewis,* 520 S.W.2d 915, 922 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.) ("The police power is grounded upon pub-

**26.** Citing *City of Coleman v. Rhone,* 222 S.W.2d 646, 649 (Tex.Civ.App.-Eastland 1949, writ ref'd), and *Neal v. Boog–Scott,* 247 S.W. 689, 691 (Tex.Civ.App.-Beaumont 1923, no writ), the dissent maintains that it is not the role of the courts to second guess the Legislature's determination that an act will serve a public use or purpose "except in instances where the legislative determination of the question is palpably and manifestly arbitrary and incorrect." According to the dissent, then, the Legislature's enactment of a statute under the guise of exercising its police power would be virtually without limits. But this is not the recognized standard of review under Texas law. *See Travelers Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007, 1011–12 (1934) (courts may not sustain the Legislature's exercise of police power where forbidden by Texas Constitution); *Missouri, Kan. & Tex. R. Co. v. Rockwall County Levee Improvement Dist. No.*

*3,* 117 Tex. 34, 297 S.W. 206, 212 (1927) (legislative exercise of police power is subject to judicial review); *Houston & Tex. Cent. Ry. Co. v. City of Dallas,* 98 Tex. 396, 84 S.W. 648, 653–54 (1905) (legislative enactments " 'are subject to investigation in the courts with a view to determining whether the law or ordinance is a lawful exercise of the police power' ") (quoting *Dobbins v. Los Angeles,* 195 U.S. 223, 236, 25 S.Ct. 18, 49 L.Ed. 169 (1904)); *see also Meyer v. Nebraska,* 262 U.S. 390, 400, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Lawton v. Steele,* 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385 (1894). Even the court of appeals in *City of Coleman* recognized that the police power, although broad and comprehensive, remains subject to constitutional limits. 222 S.W.2d at 649 ("This [police] power and the right to exercise it is limited by the Constitution.").

lic necessity[,] which alone can justify its exercise."). Courts have performed this inquiry in a number of ways.

For example, in *Martin v. Wholesome Dairy, Inc.*, this Court considered whether there was a reasonable basis for the Legislature to enact a statute regulating the sale of "filled milk," an imitation milk product known as "Farmer's Daughter High Protein Drink," based on its police power. 437 S.W.2d at 591. Wholesome Dairy sought a declaratory judgment that the statute was unconstitutional and witnesses testified in the non-jury trial. *Id.* at 587. Various doctors testified to the nutritional content of the product and whether its packaging and labeling was intended to mislead the general public into believing that the product contained natural whole cow's milk. *Id.* at 592–600. The trial court made findings of fact and conclusions of law. *Id.* at 587–88. In declaring the statute to be constitutional and within the State's police power to regulate matters relating to the health and safety of its citizens, the Court relied upon the qualifications and expertise of the doctors "together with their experience and studies in their respective fields, reflected by the record, mak[ing] admissible their opinions on the matters about which they testified." *Id.* at 602; *see also Jefco, Inc.*, 520 S.W.2d at 922 (concluding regulation fell within police power after considering evidence at trial and administrative hearing).

In *City of Houston v. Johnny Frank's Auto Parts Co.*, the court of appeals addressed whether an ordinance regulating the operation of automotive wrecking and salvage yards within the City was within the scope of the City of Houston's police power. 480 S.W.2d 774, 775 (Tex.Civ. App.-Houston [14th Dist.] 1972, writ ref'd n.r.e.). After a non-jury trial in which the trial court filed findings of fact and conclusions of law, the court found that the evidence was legally sufficient that the ordinance was a proper exercise of police power because the proof showed that such wrecking and salvage yards were a "hazard to the safety of children who are naturally attracted by such conditions." *Id.* at 780.

■ Courts have also relied upon precedent and upon matters that traditionally hinge "upon the public need for safety, health, security, and protection of the general welfare." *City of Coleman*, 222 S.W.2d at 648. Thus, the Legislature, in the exercise of the police power, may regulate occupations and professions. *See, e.g., Texas State Bd. of Barber Exam'rs*, 454 S.W.2d at 731 (barbers); *Daniel v. Tyrrell & Garth Inv. Co.*, 127 Tex. 213, 93 S.W.2d 372 (1936) (insurance companies); *Texas State Teachers Ass'n*, 711 S.W.2d at 421 (regulation of teaching profession and public education system was valid exercise of state's police power); *Texas State Bd. of Pub. Accountancy v. Fulcher*, 515 S.W.2d 950 (Tex.Civ.App.-Corpus Christi 1974, writ ref'd n.r.e.) (accountants); *Bryant v. State*, 457 S.W.2d 72 (Tex.Civ.App.-Eastland 1970, writ ref'd n.r.e.) (attorneys); *Dovalina v. Albert*, 409 S.W.2d 616 (Tex. Civ.App.-Amarillo 1966, writ ref'd n.r.e.) (polygraph operators); *Francisco v. Board of Dental Exam'rs*, 149 S.W.2d 619 (Tex. Civ.App.-Austin 1941, writ ref'd) (dentists). In declaring teaching to be a profession, courts have also recognized that the Legislature's duty to establish and maintain a public school system in Texas involves the exercise of the state's police power. *See, e.g., Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556 (Tex.1985); *Mumme v. Marrs*, 120 Tex. 383, 40 S.W.2d 31 (1931); *Passel v. Fort Worth Indep. Sch. Dist.*, 429 S.W.2d 917, 925 (Tex.Civ.App.-Fort Worth 1968) ("We think it well within the police power of the State to adopt standards to guide the administration of

our public school system ....."), *rev'd on other grounds,* 440 S.W.2d 61 (Tex.1969). "The power of the State to compel attendance at some school and to make reasonable regulations for all schools ... is not questioned." *Meyer v. State of Nebraska,* 262 U.S. 390, 402, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). And the Legislature's duty to maintain the public school system is of constitutional magnitude. *See* Tex. Const. art. VII, § 1.

In *Meyer v. Nebraska,* the Supreme Court addressed the extent of the valid exercise of the police power. 262 U.S. at 397, 43 S.Ct. 625. In that case, the Supreme Court struck down a state law forbidding instruction in certain foreign languages. *Id.* at 403, 43 S.Ct. 625. The State of Nebraska argued that, as an attribute of sovereignty, the police power exists without any reservation in the Constitution, and that it is founded on the right of the State to protect its citizens, to provide for their welfare and progress, and to insure the good of society. *Id.* at 397–98, 43 S.Ct. 625. Facing an argument by the State that the enactment of a statute barring the teaching of the German language to a child who had not passed the eighth grade comes "reasonably within the police power of the state," the Court concluded that the statute, even though under the guise of protecting the public interest, was arbitrary and "without reasonable relation to some purpose within the competency of the State to effect." *Id.* at 400, 43 S.Ct. 625. Holding that "[d]etermination by the legislature of what constitutes proper exercise of police power is not final or conclusive but is subject to supervision by the courts," the Court reasoned that even a desirable end "cannot be promoted by prohibited means." *Id.* at 400–01, 43 S.Ct. 625.

Likewise, in the 1880's, the State of Kansas, in its desire to eradicate "misery, pauperism, and crime," passed a law prohibiting the manufacture of intoxicating liquors. *Mugler,* 123 U.S. at 653, 8 S.Ct. 273. The State argued that the police power was alone competent "to the correction of these great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority." *Id.* at 658–59, 8 S.Ct. 273. In recognizing that the power to determine the extent of the police power, i.e., the extent to which "the peace and peril" of the many is endangered by the few, is lodged in the legislative branch of the government, the Court stated, "It belongs to that [legislative] department to exert what are known as the police power of the State, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety." *Id.* at 661, 8 S.Ct. 273. The Court explained, however, that the police power is limited:

It does not at all follow that every statute enacted ostensibly for the promotion of these ends, is to be accepted as a legitimate exertion of the police power of the State. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute, the courts must obey the Constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed.

*Id.* Citing *Marbury v. Madison,* 5 U.S. 137, 176, 1 Cranch 137, 2 L.Ed. 60 (1803), the Court queried, "To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?" Recognizing the singular role of the courts in determining if the enactment came within

the reasonable police powers of the state, the Court reasoned:

> The courts are not bound by mere forms, nor are they to be misled by mere pretences. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* Under these principles, the Supreme Court concluded that the manufacture and sale of intoxicating liquors fell within the police powers of the State as "protecting the community against the evils which confessedly result from the excessive use of ardent spirits," and that the regulations were not under the mere guise of police power aiming to deprive the citizen of his constitutional rights. *Id.* at 662, 8 S.Ct. 273. The dissenting justice cited to the Supreme Court of Kansas, which urged that the Legislature of the State "may have gone to the utmost verge of constitutional authority." *Id.* at 678, 8 S.Ct. 273.

We may fairly say, then, that by stripping a litigant of his rights in his pending and vested common law claim, for the purported benefit of one or more corporations succeeding to liability it seeks to shed, and without a true articulation of any "real or substantial" relation to the objects of public health, public morals, or the public safety, we must exercise our duty to adjudge that the limitations of the police power have been far exceeded, so as to no longer be in sight of those who claim to rely on it. Safety, health, morals. It cannot be sup-

posed that these objects are addressed in any real manner by this legislation. If this be an appropriate exercise of police power, what is not?

If the police power is to have any meaningful limitations, public needs must be distinguished from the financial protection of a particular private business or business segment. At the heart of the police power is its grounding in the public interest. *See Jefco, Inc.*, 520 S.W.2d at 922. Crown Cork has made no showing and there is nothing in the record to demonstrate that the Legislature's enactment of the Statute falls within the scope of the police power. Although Crown Cork protests that the Legislature reasonably exercised its police power "in favor of securing jobs and wages for thousands of Texas citizens who may benefit from the continued viability of the successor corporations for whom they work that are able to take the benefit of the limitation of liability in the Statute," this utterance alone does not bring the Statute within the police power of the State. *See Lawton*, 152 U.S. at 137, 14 S.Ct. 499; *Travelers' Ins. Co.*, 76 S.W.2d at 1011; *Missouri, Kan. & Tex. R. Co.*, 297 S.W. at 212. For the Statute to be a reasonable exercise of the State's police power, there must be a connection or relationship between the provisions of the Statute and its avowed purpose, and the Statute must be designed to accomplish the public goal.

■ Here, Crown Cork acknowledges—and even urges—that the professed purpose of the statute is "to rescue corporations like Crown Cork & Seal from the serious problems created by asbestos litigation": "The Legislature therefore enacted legislation limiting the liability of corporations sued in asbestos litigation that acquired their liability solely through a merger." But there is no showing that the purpose of the Crown Cork statute—to

save companies on the verge of bankruptcy—is served by including Crown Cork, or any other company within its scope. For us to assess the reasonableness of the statute, the Legislature's intent through findings or the plain language of the statute must be clear. *See, e.g., United States v. Lopez,* 514 U.S. 549, 562–63, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (invalidating law and explaining that lack of congressional findings hinders a court's review of legislative intent). Because the Legislature made no findings, like the Supreme Court in *Lopez,* we have no expression of legislative intent beyond the words of the statute to help us determine whether the enactment of the statute was a reasonable exercise of the Legislature's police power.

We find it significant that the Legislature declined to include any legislative findings in the Statute. *See id.* Although House Bill 4 includes legislative findings that address health care liability claims, *see* Act of June 11, 2003, *supra,* § 10.11, 2003 Tex. Gen. Laws at 884, there are no similar legislative findings regarding the Statute. Thus, to the extent Crown Cork relies on "the asbestos litigation crisis" and its own fragile financial condition, there are no legislative findings on these issues. Nor does the text of the Statute itself convey an emergency or crisis regarding asbestos litigation or the fragile financial condition of any corporation, foreign or domestic. Even so, the Texas Supreme Court has held that emergency conditions do not allow the Texas Legislature to enact a statute that destroys vested rights in violation of the Texas Constitution. *See Travelers' Ins. Co.,* 76 S.W.2d at 1011.

We conclude the activity sought to be addressed in the Statute does not fall within the scope of the police power, it is not reasonable in its exercise of that power, and it does not, in any event, override the constitutional interest in preserving the common law claim. The Statute, as applied to Satterfield, is unconstitutional because it violates the prohibition against retroactive laws embraced by the people of Texas in their Bill of Rights.

## CONCLUSION

It is a matter of fundamental fairness and the lynchpin of our justice system that the settled expectations of litigants and in particular any validly vested rights not be defeated by subsequently enacted legislation. That the people of Texas recognized the importance of predictability and stability in their justice system and the potential for the powerful to obtain special and improper benefits[27] is fully reflected in the plain language of the Texas Constitution. The Texas Constitution continues to speak plainly and eloquently to prohibit legislation that undermines its sound notions of fundamental fairness as understood by the people when they voted on its adoption.

Based on the structure and plain language of the Texas Constitution, as well as the weight of binding precedent, we conclude the Statute is an unconstitutional retroactive law as applied to Satterfield's claims against Crown Cork. As applied to Satterfield, we conclude that the Statute retroactively destroys her vested rights in accrued common law tort claims against Crown Cork and that the Statute violates article I, section 16 of the Texas Constitution.

For these reasons, we reverse the trial court's summary judgment and remand this case to the trial court for further proceedings.

Dissenting opinion by Chief Justice LAW.

---

**27.** *See Landgraf,* 511 U.S. at 267 n. 20, 114 S.Ct. 1483.

W. KENNETH LAW, Chief Justice, dissenting.

After careful consideration of the record and extensive analysis of the governing legal authority—including that which is proffered as support for conclusions in the majority opinion—I believe that Satterfield has not met her heavy burden of demonstrating that chapter 149, as applied to her case, violates article I section 16 of the Texas Constitution, and I respectfully dissent. The presumption of constitutionality that is afforded to chapter 149 cannot be overcome without showing that the statute abrogated a vested right, that it deprived Satterfield of all remedy for her claims, and that it was an improper exercise of legislative police power. The majority opinion is fundamentally flawed because (1) it does not discern that Satterfield's successor-liability theory against Crown was neither a cause of action nor a vested right, (2) it favors Pennsylvania law over Texas law on the availability of Satterfield's remedy, and (3) it does not recognize the legislature's right to reasonably exercise its police power after balancing the competing considerations on its own.

Additionally, because Satterfield did not demonstrate that chapter 149 is a special law that violates article III section 56 of the Texas Constitution and because Crown conclusively established its affirmative defense limiting its post-merger successor

liability, I would affirm the trial court's judgment. I write separately for full discussion of the issues presented in this appeal.

## Overview

A major development in the proliferation of asbestos litigation, the "longest-running mass tort litigation in the United States,"[1] has been the increased involvement of defendants who were not major manufacturers or distributors of asbestos. *In re Joint E. & S. Dists. Asbestos Litig.*, 237 F.Supp.2d 297, 300 (E.D.N.Y.2002). Defendants in asbestos litigation are no longer confined to a core group of companies who processed asbestos or used it extensively. *Id.* at 305. Instead, the pursuit of solvent defendants has led to the involvement of over 6,000 companies, in virtually every type of American industry, whose connection to asbestos is attenuated. *Id.*

That trend is evident in this case, in which Braley sued numerous corporations including Crown[2] in Texas,[3] seeking damages for injuries that he attributed to his exposure to asbestos-containing products.[4] Although Crown itself never manufactured, sold, or distributed asbestos-containing products, it was the successor by merger to a corporation that did: Mundet. Because of its merger with Mundet, Crown has been named in more than 20,000 successor-liability cases in Texas alone. *See, e.g., Robinson v. Crown Cork & Seal Co.,*

---

1. *In re Asbestos Litigation,* 59 Pa. D. & C.4th 62, 65, 2002 WL 1305991 (Pa.Ct.Cm.Pl.2002), *rev'd on other grounds, Ieropoli v. AC & S Corp.,* 577 Pa. 138, 842 A.2d 919 (2004).

2. Crown was a New York-based company when it merged with Mundet, but it has been incorporated in Pennsylvania since 1989.

3. Braley chose to file suit in Travis County, even though he had lived in Wyoming for over twenty years and alleged that he was exposed to asbestos-containing products in five states, including the state of his residence. He was

never an Austin or Travis County resident. Venue in this case was based on the principal office of one defendant who had already provided a settlement. Given these facts, Crown correctly noted that the relationship between Braley's suit and the state of Texas was "tenuous."

4. Braley smoked a pack of cigarettes daily since the age of fourteen. Against his physicians' advice, he continued to smoke, even after his cancer diagnosis and his lawsuit's filing.

251 S.W.3d 520, 538 n. 12 (Tex.App.-Houston [14th Dist.] 2006, pet. granted). The record reflects that through May 2003, Crown had already paid asbestos-related claims totaling more than $413 million.

### 1966 Crown–Mundet merger

The successor-liability theory Satterfield asserts against Crown is based on its merger with Mundet more than four decades ago. Mundet had a thermal-insulation division that manufactured, sold, and installed asbestos products before 1963. Mundet also had a "closure" division, which was not involved with asbestos at all. The closure division, like Crown, manufactured and sold metal bottle caps lined with cork, known in the industry as "crowns." Crown sought to acquire Mundet's closure division. After being informed that the closure division would not be sold separately, Crown purchased a majority of Mundet stock for approximately $7 million on November 13, 1963. Mundet had ceased manufacturing insulation products during the summer before Crown's stock purchase.

Immediately after the stock purchase and at Crown's request, Mundet began looking for a purchaser for the insulation division. Mundet sold the insulation division within ninety days, on February 8, 1964, to a manufacturer and seller of asbestos-containing insulation products, Baldwin–Ehret–Hill, Inc. ("B–E–H"). As part of the purchase agreement, B–E–H acquired the books, records, employees, equipment, finished goods, trademarks, licenses, raw material, and post-purchase liabilities of Mundet's insulation division. In 1966, two years after B–E–H purchased Mundet's insulation division, Crown and Mundet merged.[5]

Based on this merger, Braley filed a motion for partial summary judgment asserting that "Crown Cork [wa]s responsible for the products and conduct of Mundet Cork, which it acquired through merger."[6] The trial court granted the motion, imposing liability on Crown for damages caused by asbestos-containing products that were manufactured, sold, or distributed before February 8, 1964, by Mundet.

### Enactment of chapter 149

Recognizing that successor corporations could be bankrupted by liability for asbestos-related injuries that they did not cause and recognizing the risks to Texas jobs and pensions, the legislature enacted the liability limitation in chapter 149 of the civil practice and remedies code on June 2, 2003. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 149.001–.006; *see also* H.J. of Tex., 78th Leg., R.S. 6042–43 (2003). The statute was made applicable to domestic corporations that were organized under Texas law, and to foreign corporations— like Mundet and Crown—organized under the law of another jurisdiction. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 149.001(2); .002.

Under the statute, a successor corporation that had paid claims equivalent to the statutory limit would remain liable only for

---

5. The majority assumes that Crown acquired all of Mundet's pre-merger liabilities. Nowhere in the certificate of merger does Crown assume any liabilities of Mundet.

6. Crown's response to Braley's motion for partial summary judgment clarified that when a Wyoming resident files a lawsuit against a Pennsylvania corporation in a Texas court, Texas choice-of-law rules apply. Moreover, Crown noted that the tort liability in this case was based on the alleged torts of Mundet— Crown was not a "bad actor" but an innocent successor corporation. The parties disputed whether the punitive damages issue should be governed by Pennsylvania or New York law. However, because statutes from either state provided that Crown would have succeeded to Mundet's compensatory liability, the lack of contest to such liability is unsurprising.

certain types of claims or if the successor continued the business of manufacturing, selling, or distributing asbestos-containing products after the merger. *Id.* § 149.002(b) (providing that liability limitations in section 149.003 do not apply to certain claims, including those for workers' compensation, premises liability, and pending settlement contracts for asbestos claims; or to successors who continue business of mining asbestos, or manufacturing, selling, or distributing asbestos-containing products after merger or consolidation). Here, the record reflects that by mid–2003, Crown had already paid cumulative asbestos-related liabilities over $413 million—more than six times the statutory limit.

The legislature also codified a choice-of-law provision in chapter 149 that made Texas law applicable to every successor-liability suit filed in the state, even if the issue of post-merger liability would have otherwise been governed by another state's law under choice-of-law rules such as the common law "most significant relationship" test.[7] *Id.* § 149.006.

Additionally, the legislature expressly provided that chapter 149 would become "effective immediately" in all cases commenced on or after June 11, 2003. *See* Act of June 2, 2003, 78th Leg., R.S., ch 204, § 17.02, 2003 Tex. Gen. Laws 895; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 149.001 (referencing historical note that designates June 11, 2003, as statute's effective date). Cases pending as of June 11, 2003, have chapter 149 applied to them.[8] *Id.* (mandating application of chapter 149 to all cases "in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after that effective date."). Because this suit against Crown was pending on June 11, 2003, and set for trial on November 3, 2003, chapter 149 applied to it.

**No vested right in successor-liability remedy**

Successor liability issues are fact-intensive—given the "myriad factual circum-

---

**7.** Texas courts use the Restatement's "most significant relationship" test to decide choice-of-law issues, applying the law of the state with the most significant relationship to the particular issue to be resolved. *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 848 (Tex. 2001); *Hughes Wood Prods., Inc. v. Wagner,* 18 S.W.3d 202, 204 (Tex.2000); Restatement (Second) of Conflict of Laws §§ 6, 145 (1971).

**8.** It is undisputed that the legislature intended chapter 149 to apply to pending cases. That clear legislative intent would be a decisive factor in upholding the constitutionality of the statute if it were scrutinized only under analogous federal law. The Supreme Court held that the judiciary's first task when considering a case that challenges a statute enacted after the events in suit is to determine whether Congress has expressly prescribed the statute's proper reach:

"If Congress has done so [expressly prescribed the statute's proper reach], of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the

court must determine whether the new statute would have retroactive effect.... If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result."
*Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483 (1994); *see also Fernandez–Vargas v. Gonzales,* 548 U.S. 30, 37, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006) (quoting *United States v. St. Louis, San Francisco & Tex. Ry. Co.,* 270 U.S. 1, 3, 46 S.Ct. 182, 70 L.Ed. 435 (1926)) (holding that "a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication"); Tex. Gov't Code Ann. § 311.022 (West 2005) ("A statute is presumed to be prospective in its operation unless expressly made retroactive."); *cf. Johns–Manville Sales Corp. v. R.J. Reagan Co.,* 577 S.W.2d 341 (Tex.Civ.App.-Waco 1979, writ ref'd n.r.e.) (invalidating statute that lacked any provision making it expressly retroactive).

stances and legal contexts in which it can arise," the Supreme Court has noted that "an emphasis on the facts of each case as it arises is especially appropriate." *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 256, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). The majority veers from any analysis of the facts that inform the vested-rights issue and in doing so, confuses a theory of successor-liability against Crown with a cause of action against Mundet.[9] It states that "the question presented is whether an accrued and pending common law cause of action is a vested right and thus protected by the Texas Constitution." But what follows that statement is an analysis of vested rights in a vacuum. Nowhere does the majority opinion identify what "cause of action" or which "common-law claims" against Crown have supposedly vested. There were none. As the summary-judgment evidence in this record demonstrates, Crown itself never manufactured, sold, or distributed asbestos-containing products, and Braley was not injured by any act or omission on the part of Crown.[10] *Cf. Barker v. Eckman*, 213 S.W.3d 306, 311 (Tex.2006) ("This Court has consistently held that a cause of action accrues when a party has been injured by actions or omissions of another.").

The successor-liability theory does not create a cause of action. *In re Fairchild Aircraft Corp.*, 184 B.R. 910, 920, 921 n. 11(Bankr.W.D.Tex.1995), *vacated on other grounds*, 220 B.R. 909 (Bankr.W.D.Tex. 1998); *see National Architectural Prods. Co. v. Atlas–Telecom Servs.*, No. 3:06–CV–0751–G ECF, 2007 WL 2051125, at *12, 2007 U.S. Dist. LEXIS 51182, at *34 (N.D.Tex.2007) (noting that issue of whether sale-of-assets agreement subjected corporate defendant to successor liability was not one sounding in tort). The theory merely allows for the transfer of liability from the predecessor to the successor. *In re Fairchild Aircraft Corp.*, 184 B.R. at 920, 921 n. 11; *see Griggs v. Capitol Mach. Works, Inc.*, 690 S.W.2d 287, 289 (Tex. App.-Austin 1985, writ ref'd n.r.e.) (noting that liability sought to be imposed against successor corporation was vicarious because it was not based on any act or omission by successor but on its imputed liability for act or omission of dissolved predecessor corporation); *see also R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, 901 F.Supp. 630, 636 (S.D.N.Y.1995) (characterizing successor liability as "fundamentally a form of secondary, vicarious liability imposed upon an innocent party"). Successor liability supplies the claimant with a remedy when a predecessor corporation ceases to exist—e.g., because of a dissolution or merger—and cannot be sued. *See White v. Cone–Blanchard Corp.*, 217 F.Supp.2d 767, 774 n. 1 (E.D.Tex.2002). Here, it allows Crown to be considered a "tortfeasor" by virtue of its merger with Mundet.

---

**9.** The majority's discussion of vested rights in this as-applied challenge leaves significant questions unanswered with regard to Crown: What were Braley's accrued causes of action or common-law claims against Crown? What duty was owed to Braley by a corporation that never manufactured, sold, or distributed asbestos-containing products? What theory of recovery permits Braley to seek damages from Crown? What "validly vested rights" did Braley have against Crown that were affected by chapter 149?

**10.** The majority discerns no dispute between the parties that "the causes of action Braley asserted against Crown Cork accrued prior to the Statute's enactment." Review of the record and briefing show otherwise, as Crown has consistently maintained that it was sued as Mundet's successor and that the causes of action alleged in this case accrued against the alleged tortfeasor, Mundet.

Thus, the successor-liability theory is the procedural remedy that makes recovery possible for the torts Satterfield has attributed to Mundet, from whom she would otherwise have no recovery at all. The precise question presented to this Court is whether Satterfield had a vested right to that successor-liability remedy against Crown under the Texas Constitution. After considering the parameters of a "vested right" that receive constitutional protection and applying them to the facts of this record, I am persuaded that she did not.

### Vested rights are certain and immediately enforceable

In her first issue, Satterfield contends that chapter 149 retroactively impaired a vested right. Vested rights are property rights, which the constitution protects like any other property. *Subaru, Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex.2002) (citing *Middleton v. Texas Power & Light Co.*, 108 Tex. 96, 185 S.W. 556, 560 (1916)). Article I, section 16 of the Texas Constitution, which prohibits the enactment of retroactive laws, protects vested rights by excluding them from the reach of subsequently enacted legislation. *See* Tex. Const. art. I, § 16. Statutes that do not affect a claimant's vested rights, however, are not shielded by article I, section 16. *State v. Project Principle, Inc.*, 724 S.W.2d 387, 390 (Tex.1987) (stating that laws are deemed retrospective and constitutionally prohibited if their retrospective operation destroys or impairs vested rights); *De Cordova v. City of Galveston*, 4 Tex. 470, 479–80 (Tex.1849) (same); *see also Corpus Christi People's Baptist Church v. Nueces County Appraisal Dist.*, 904 S.W.2d 621, 626 (Tex. 1995) (concluding that provision in tax code allowing exemption to be established after taxes were assessed was not retroactive law because taxing unit had no vested right to taxes until determination of exemption). Thus, in the absence of a constitutional prohibition, the legislature may change statutory or common law, but in so doing, it may not deprive a person of a property right acquired under existing law. *Aetna Ins. Co. v. Richardelle*, 528 S.W.2d 280, 284 (Tex.Civ.App.-Corpus Christi 1975, writ ref'd n.r.e.).

Whether a particular right is vested is a difficult question, *Grocers Supply Co. v. Sharp*, 978 S.W.2d 638, 643 (Tex.App.-Austin 1998, pet. denied), but a key characteristic of a vested legal right is its immediate legal enforceability. *See Mellinger v. Houston*, 68 Tex. 37, 3 S.W. 249, 253 (1887); *see also Corpus Christi People's Baptist Church*, 904 S.W.2d at 626. The Texas Supreme Court explained that "a right, in a legal sense, exists, when in consequence of given facts the law declares that one person is *entitled to enforce* against another a claim or to *resist the enforcement* of a claim urged by another." *Mellinger*, 3 S.W. at 253 (emphasis added); *see also Corpus Christi People's Baptist Church*, 904 S.W.2d at 626 (noting that taxes that were due on receipt and became delinquent next year if unpaid, represented liability "for which the taxing unit may enforce collection"). The court further defined "rights" as "well-founded claims," meaning those claims that are "recognized or secured by law." *Mellinger*, 3 S.W. at 253. Demonstrating its definition of vested rights, the court in *Mellinger* struck a statute that was enacted after a taxpayer's suit was filed, barring the taxpayer's defense of limitations to a city's tax collection suit. *See* 3 S.W. at 249–251. Determinative considerations for the *Mellinger* court were the lack of any suggestion that the legislature intended to make the law applicable to pending cases and the taxpayers' right to rely on the defense of limitations, which vested on the expiration of the limitations period and prevented the city's tax

claim from being enforced. *See id.* at 251–53.[11]

Echoing these considerations of legal enforceability, Texas courts have held that vested rights are those that imply an immediate right or an entitlement—those that are not based upon mere expectation or contingency. *See City of Dallas v. Trammell,* 129 Tex. 150, 101 S.W.2d 1009, 1014 (1937); *Walls v. First State Bank of Miami,* 900 S.W.2d 117, 121 (Tex.App.-Amarillo 1995, writ denied); *Houston Indep. Sch. Dist. v. Houston Chronicle Publ'g Co.,* 798 S.W.2d 580, 589 (Tex.App.-Houston [1st Dist.] 1990, writ denied); *see also Attorney General of Tex. v. Redding,* 60 S.W.3d 891, 893 (Tex.App.-Dallas 2001) (noting that defendant's right to rely on statute of limitations vests when limitations period expires); *Baker Hughes, Inc. v. Keco R. & D., Inc.,* 12 S.W.3d 1, 4 (Tex.1999) (same).

### Choice-of-law rules are alterable

The majority suggests that chapter 149 disrupted Satterfield's settled expectations in this case. It did not. Satterfield lacked any immediate entitlement or legally enforceable right to impose successor liability on Crown. Her successor-liability remedy depended entirely on the application of New York law through choice-of-law rules and those rules may be altered by statute in the same manner as other Texas law. *See Owens Corning v. Carter,* 997 S.W.2d 560, 574 (Tex.1999) (recognizing that courts may make reasoned adjustments in legal system); *see also* Restatement (Second) of Conflict of Laws § 5 (choice-of-law rules are as open to reexamination as any other common-law rules), 5 William V. Dorsaneo III, *Texas Litigation Guide* § 62.01[1] (2007) (same).

Texas law did not impose successor liability based on the merger of two foreign corporations-those incorporated outside Texas-until chapter 149 was enacted. *See* Tex. Bus. Corp. Act Ann. art. 1.02(14) (defining "foreign corporation" as "a corporation for profit organized under laws other than the laws of this State"), (18) (West Supp.2006) (defining "merger" as division of domestic corporation into two or more new domestic corporations, or into surviving corporation and at least one new domestic corporation, or combination of one or more domestic corporations with other entities). Mundet and Crown were considered "foreign corporations," because they were incorporated in a state other than Texas. *See id.* art. 1.02(11) (West Supp. 2006) (defining "domestic corporation" to exclude "foreign corporation"), (14).[12] When this suit was filed against Crown, Texas courts had to apply the law of the

**11.** In attempt to characterize Satterfield's successor-liability theory against Crown as a vested right, the majority relies heavily on a line of cases concluding that, after the expiration of time required by a statute of limitations, the legislature cannot abrogate a defendant's vested right to assert a limitations defense. *See, e.g., Baker Hughes, Inc. v. Keco R. & D., Inc.,* 12 S.W.3d 1, 4 (Tex.1999); *Mellinger v. Houston,* 68 Tex. 37, 3 S.W. 249, 253 (1887); *De Cordova v. City of Galveston,* 4 Tex. 470, 479–80 (Tex.1849). Those are not the facts of this case.

Moreover, the holdings in those cases would contradict the majority's suggestion that a claimant has a vested right to a statuto-ry remedy immediately upon filing suit. This is because merely filing suit would not decide the legal enforceability or entitlement to the relief sought by the claimant. For example, if a suit were filed after the expiration of a limitations period, the defendant would have an immediate, legally recognized right under Texas law to dismissal of the suit on limitations grounds, and that right could not be defeated by the claimant's assertion of a competing "vested interest" based solely on the suit's filing.

**12.** These definitions remain unchanged from the 2003 version in effect when Braley sought partial summary judgment to establish Crown's liability as Mundet's successor.

state with the "most significant relationship" to the merger to determine which state's law should apply and whether that state's law would provide for the imposition of successor liability. *See Torrington Co. v. Stutzman,* 46 S.W.3d 829, 848–49 (Tex.2001) (elaborating on "most significant relationship" test set forth in sections 6 and 145 of Restatement (Second) of Conflict of Laws for determining choice-of-law issues).

Mundet and Crown were incorporated in New York when they merged, and their certificate of merger was filed in New York pursuant to New York law. Using the most-significant-relationship test, the trial court determined that New York law should apply to the issue of successor liability. It also determined that New York law provided for the imposition of successor liability against Crown.[13] *See* N.Y. Bus. Corp. Law Ann. § 906(b)(3) (McKinney 2003) ("[t]he surviving ... corporation shall assume and be liable for all the liabilities ... of the constituent entities. No

liability ..., claim or demand for any cause existing against any such constituent entity ... shall be released or impaired by such merger"). Accordingly, the court granted Braley's motion for partial summary judgment on the issue of liability.

However, the enactment of chapter 149's choice-of-law provision, requiring courts to apply Texas law to the issue of successor asbestos-related liabilities, superseded the common law's most-significant-relationship test and rendered New York law inapplicable to this suit.[14] *See* Tex. Civ. Prac. & Rem.Code Ann. § 149.006; *see also Citizens Ins. Co. of Am. v. Daccach,* 217 S.W.3d 430, 443 (Tex.2007) (stating that when deciding which jurisdiction's law applies, "[t]he first question is whether the particular substantive law is subject to a clear choice of law determination by the Legislature of the forum state"); *American Home Assurance Co. v. Safway Steel Prods. Co.,* 743 S.W.2d 693, 697 (Tex.App.-Austin 1987, writ denied) (reasoning that

**13.** Satterfield argued that the trial court's choice of law was irrelevant because the successor-liability law was the same in Texas as in New York. She noted that article 5.06 of the Business Corporation Act states that the surviving company "inherits the liabilities of its predecessors" after merger. *See* Tex. Bus. Corp. Act Ann. art. 5.06 (West 2003). Her reliance on article 5.06 is misplaced. That article applies only to a merger involving at least one domestic corporation organized under Texas laws, and neither Crown nor Mundet were domestic corporations. *See id.* art. 1.02(11) (defining "domestic corporation" to exclude "foreign corporation"), (14) (defining "foreign corporation" as "a corporation for profit organized under laws other than the laws of this State"), (18) (defining "merger" as division of domestic corporation into two or more new domestic corporations, or into surviving corporation and at least one new domestic corporation, or combination of one or more domestic corporations with other entities) (West Supp.2006). Article 5.06 does not apply to a merger between two foreign corporations, like Crown and Mundet, that

did not incorporate in Texas. *See id.* art. 1.02(14), (18).

**14.** The majority states that Crown did not dispute that it was liable for Mundet's tortious conduct under Texas law and that Crown's motion for summary judgment "conceded" its successor liability in the absence of chapter 149. However, the record reflects that Crown did dispute its successor liability under Texas law as it existed before the enactment of chapter 149. Crown opened its discussion of the successor-liability issue in its motion for summary judgment with a reference to the general rule of article 5.06. It explained the exception to that general rule in its reply, which expressly contends that article 5.06 is inapplicable to the merger of these two foreign corporations, that Satterfield's only theory of recovery from Crown is based on the doctrine of successor liability, and that, until the enactment of chapter 149, successor liability involving the merger or consolidation of solely foreign corporations was not recognized by Texas law. *See id.* art. 1.02(14), (18).

most-significant-relationship analysis is unnecessary if local statutory provision controls disposition of choice-of-law question).

After the enactment of chapter 149, Satterfield had no right to the continued application of New York's successor-liability law through choice-of-law rules. A "right" is a claim that one is entitled to enforce against another and a "vested right" requires more than a mere expectancy based upon an anticipated continuance of an existing law. *See Mellinger,* 3 S.W. at 253; *Trammell,* 101 S.W.2d at 1014. Satterfield may have anticipated that New York's successor-liability law would apply to her suit, but the application of New York law depended on the use of choice-of-law rules and the lack of a Texas statute governing successor liability for foreign corporations after their merger. *See Daccach,* 217 S.W.3d at 443.[15]

**15.** The majority states that Crown's summary judgment "did not raise the arguments that the Statute does not impair vested rights because it merely changes the choice of law provision or that Satterfield has no vested right in a remedy or statutory choice of law provision." However, in direct response to Satterfield's assertion of a vested right, Crown did make this argument to the trial court:

Plaintiff's cause of action accrued against Mundet Cork Corporation, the alleged tortfeasor. Liability, if any, for the torts of Mundet, a foreign corporation, could transfer to Crown, a foreign corporation, only by application of the doctrine of successor liability—a creature of individual state statute. Without the application of this statutorily created remedy, plaintiffs would have no hope of recovery against successor corporation for the alleged torts of dissolved predecessors. Prior to the adoption of HB 4, Texas substantive law did not govern successor liability involving the merger or consolidation of solely foreign corporations.... In Texas courts, therefore, the successor liability of foreign corporations that merged with other foreign corporations was then determined by choice-of-law principles.... HB 4 changes this uncertainty. It is, first, a codified choice of law provision dictating the use of Texas substantive law in Texas courts to determine the asbestos-related successor liability of some foreign and domestic corporations.... Rather than deprive Plaintiff of a vested right, therefore, HB 4 created a Texas substantive remedy where no Texas substantive remedy previously existed.... Plaintiff could not have had a legitimate expectation that a particular foreign state's law would be applied through choice of law principles until a final judgment [was] rendered in this case.... HB 4 is a codified choice-of-law provision that also creates a Texas statutory

remedy where none existed before. It cannot therefore be held to frustrate legitimate expectations or impair vested rights. [Citations omitted].

The majority suggests that issues raised by this argument cannot be considered because they were in Crown's reply. However, Rule 166a(c) supports a different conclusion. *See* Tex.R. Civ. P. 166a(c); *see also Alder v. Laurel,* 82 S.W.3d 372, 375–76 (Tex.App.-Austin 2002, no pet.) ("[A] trial court considering a motion for summary judgment is restricted to the issues raised in the motion, response, and subsequent replies.") (citing *Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex. 1993)); *Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 674–77 (Tex.1979); *Blakey v. Texas Dep't of Health,* No. 03–02–00682–CV, 2004 WL 334866, at *6, 2004 Tex.App. LEXIS 1247, at *18–19 (Tex.App.-Austin 2004, no pet.) (noting that this Court was unconvinced that summary judgment rule always prohibited movant from supplementing its grounds by way of reply if the nonmovant is not otherwise unfairly prejudiced by supplementation). Rule 166a(c) provides that

The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion *or in an answer or any other response.* Issues not expressly presented to the trial court by *written motion, answer or other response*

Satterfield's reliance on existing choice-of-law rules for the application of New York law resembles that of the Alabama claimants in *Owens Corning*, who relied on a Texas statute permitting them to file their asbestos-exposure claims in Texas. 997 S.W.2d at 565. Under that statute, if the claimants' suits were timely under Texas's statute of limitations, the suits could proceed in Texas, regardless of whether limitations had expired in the state where the wrongful act actually occurred. *Id.* After Texas courts became crowded with asbestos-exposure claims having little or no connection to the state, the legislature enacted a borrowing statute, providing that foreign claims could be brought in Texas only if those claims could also be brought in the state where the wrongful act occurred (thus "borrowing" the state's statute of limitations for application in Texas). *Id.* at 565–66. The statute was given immediate effect, without allowing affected parties a reasonable grace period for filing their claims after its enactment. *Id.* at 572. The Texas Supreme Court upheld the constitutionality of the borrowing statute, which it characterized as "essentially a codified choice-of-law rule." *Id.* at 573. It noted that any concerns about expectations the litigants might have had concerning the continued application of Texas's statute of limitations played only a "minimal role" in the case. *Id.*

Like the borrowing statute in *Owens Corning*, chapter 149 contains a codified choice-of-law provision that creates a Tex-

as-statutory remedy where none existed before-Texas had no law governing successor liability for foreign corporations after their merger. Where the common law is revised by statute, the statute controls. *Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 146 (Tex.2003); *Pittman v. Time Sec.*, 301 S.W.2d 521, 523 (Tex.Civ.App.-San Antonio 1957, no writ). "The Texas Constitution has not undertaken to preserve inviolate the rules of the common law," and because no one has any vested or property interest in common-law rules, no one is deprived of a constitutional right when the common law is changed through legislative enactment. *Middleton*, 185 S.W. at 560–61; *Smith v. Smith*, 126 S.W.3d 660, 663 (Tex.App.-Houston [14th Dist.] 2004, no writ); *see also Columbraria Ltd. v. Pimienta*, 110 F.Supp.2d 542, 548 (S.D.Tex. 2000) ("No person has a vested right in any general rule of law or policy of legislation entitling him to insist that it remain unchanged for his benefit."). Satterfield did not have a vested right to a successor-liability remedy that was dependent on choice-of-law rules.

### *Final judgments are legally enforceable*

The majority makes the broad assertion that "Satterfield's cause of action was accrued and pending, or vested, prior to the effective date of the Statute." But it offers no authority for the proposition that the mere filing of suit on a claimed injury constitutes a vested right to a statutory remedy provided by choice-of-law rules.

shall not be considered on appeal as grounds for reversal.
Tex. R. Civ. P. 166a(c) (emphasis added). Because the issues addressing chapter 149's lack of impairment of a vested right based on a mere change to a choice of law provision and Satterfield's lack of a vested right in a remedy or statutory choice of law provision were expressly presented to the trial court by written response, the issues may be considered here.

Additionally, Satterfield was not prejudiced by the supplementation. She filed a rejoinder brief the day after Crown filed its reply, and the trial court's order specifies that it considered "the Motion, Plaintiff's Objections to Crown Cork & Seal Company, Inc.'s Summary Judgment evidence and Response to Motion for Summary Judgment, Defendant's Reply, and Plaintiff's Rejoinder."

Satterfield's legal argument in this summary-judgment case would be stronger if she had obtained a final judgment before the enactment of chapter 149. With a final judgment, she could have claimed a legally enforceable entitlement to her successor-liability remedy. *See Mellinger,* 3 S.W. at 253 (defining "right" as claim that is "recognized or secured by law."). In that situation, the triggering event that would vest the right to impose New York's successor-liability law on Crown would be the entry of a final judgment, not the filing of a suit. *See Dickson v. Navarro County Levee Improvement Dist. No. 3,* 135 Tex. 95, 139 S.W.2d 257, 259 (1940); *Durham Transp. Co. v. Beettner,* 201 S.W.3d 859, 875 (Tex. App.-Waco 2006, pet. denied); *Walls,* 900 S.W.2d at 122; *Trahan v. Trahan,* 894 S.W.2d 113, 119 (Tex.App.-Austin 1995, writ denied); *Houston Chronicle Publ'g Co.,* 798 S.W.2d at 589; *see also Pimienta,* 110 F.Supp.2d at 548 ; *Thompson v. Miller,* No. 03–98–00627–CV, 1999 WL 549205, at *2, 1999 Tex.App. LEXIS 5538, at *4 (Tex.App.-Austin 1999, no pet.) (not designated for publication) (holding that any right claimant might have had to receive certain information prior to statute's amendment was not vested because his lawsuit had not been resolved).

Without a final judgment, Satterfield did not have a vested right, and her statutory successor-liability remedy was not beyond the reach of subsequently enacted legislation. *See Mellinger,* 3 S.W. at 253; *Trammell,* 101 S.W.2d at 1014; *Walls,* 900 S.W.2d at 121; *Houston Chronicle Publ'g Co.,* 798 S.W.2d at 589. Since 1849, the Texas Supreme Court recognized that legislative acts are not within the prohibition against retrospective laws unless they impair rights that are vested, *De Cordova,* 4 Tex. at 479, and in support of that proposition, the court considered a case that invalidated a statute "purporting to grant a new trial in a civil cause after a final judgment." *Id.* at 477. Today the majority rejects the significance of a final judgment in the vested-rights inquiry, but its significance was previously recognized by the opinion's author. *See American Honda Motor Co. v. Texas Dept. of Transp.– Motor Vehicle Div.,* 47 S.W.3d 614, 623 (Tex.App.-Austin 2001, pet. denied) (noting approval of this Court's conclusion that claimant "did not have a vested right to protest because House Bill 1595 [rescinding the right to protest] took effect prior to the time the Board rendered a final decision") (citing *Robbins Chevrolet Co. v. Motor Vehicle Bd.,* 989 S.W.2d 865, 870 (Tex.App.-Austin 2001, pet. denied)). The reasoning followed by the author in *Miller* applies here—Satterfield did not have a vested right to enforce the successor-liability remedy because chapter 149 took effect before the trial court entered a final judgment.

The Texas Supreme Court's opinion in *Dickson* illustrates the concept that a final judgment is necessary to claim a vested right to a statutory remedy that subsequently collapses by legislative action. *See* 139 S.W.2d at 259. In that case, E.K. Atwood held levee bonds issued by two improvement districts. *Id.* at 258. Bondholders like Atwood had a statutory remedy allowing them to sue landowners to enforce delinquent taxes on the bonds if the districts failed to do so within sixty days after the taxes became delinquent. *Id.* Atwood, acting on behalf of the Navarro County Levee Improvement District No. 3, sued three landowners in district court to recover the taxes that they failed to pay for 1933 and 1934. *Id.* On June 25, 1937, Atwood obtained a default judgment in favor of the district for the delinquent taxes. *Id.*

While the case was on appeal, the legislature repealed the statute authorizing the bondholders' remedy. *Id.* at 259. The

court of appeals subsequently affirmed the district court's default judgment. *Id.* But the supreme court set it aside, concluding that the legislature's repeal of the bond-holder-enforcement statute had "wholly collapsed" the "special remedial privilege" that had been afforded to Atwood as a bond purchaser. *Id.* The court rejected the notion that Atwood had been "robbed of some right" and noted although the district had obtained a judgment in its favor, the court had never entered a final judgment. *Id.* at 260.

Another case highlighting the significance of securing final adjudication when pursuing a statutory remedy is *Richardelle. See* 528 S.W.2d at 285–86. In *Richardelle,* application of a newly enacted parental-liability statute deprived an insurer of the ability to enforce a favorable jury verdict. *Id.* at 282. The verdict was against the Richardelles, parents of an eleven-year-old child who set fire to a residence. *Id.* Aetna, which insured the residence, sued the parents to recover funds paid to the homeowners on their fire-damage claim. *Id.* Although the right to attribute liability to parents for the torts of their minor children was not recognized at common law, *id.* at 285; *see also In re D.M.,* 191 S.W.3d 381, 388 (Tex.App.-Austin 2006, pet. denied), a statute in effect on the date of the fire in 1972 allowed property owners to seek compensation from parents whose children were at least ten years old when they damaged or destroyed property maliciously. 528 S.W.2d at 283. That parental-liability statute was repealed on January 1, 1974, with the addition of a new title to the family code, the day before Aetna filed suit. *Id.* The new law still allowed parents to be held liable for any property damage caused by the willful and malicious conduct of their children, but it raised the minimum age of the child to twelve. *Id.* Because the Richardelles' son was eleven years old when he set fire to

the house, this statute afforded the Richardelles a new statutory defense to Aetna's suit.

Aetna argued that the suit should be governed by the law in effect when the Richardelles' son set the fire and that the new law destroyed its vested right to proceed against the parents of ten-and eleven-year-old children who committed willful and malicious torts. *Id.* Rejecting Aetna's assertion of a vested right, the court stated that no person has a vested right to a particular remedy accorded by law, either at common law or by statute. *Id.* at 284 (citing *Middleton,* 108 Tex. 96, 185 S.W. 556). It noted that the statute giving Aetna the right to sue the Richardelles was repealed before proceedings commenced to enforce such right, and before the repeal Aetna had not been granted final relief on the enforcement of its demand. *Id.* at 285–86; *see Walls,* 900 S.W.2d at 122.

The concept that rights vest upon final adjudication is also illustrated in a recent decision from a Florida court that considered a retroactivity challenge to the state's Asbestos and Silica Compensation Fairness Act. *See DaimlerChrysler Corp. v. Hurst,* 949 So.2d 279, 281 (Fla.Dist.Ct.App. 2007, pet.denied). Due to a flood of asbestos litigation, the Florida legislature passed a law barring smokers from filing or maintaining civil suits that attributed their lung cancer to asbestos exposure unless they provided a diagnosis from a qualified physician concluding that exposure to asbestos was a substantial contributing factor to their cancer. *Id.* at 283–84. The legislature specified that the Act was to be applied to all pending asbestos-related cases in which trial had not commenced as of the effective date. *Id.* at 284–85. The claimant in *Hurst* was the wife of the decedent, who had quit smoking about thirteen years before his lung cancer diag-

nosis. *Id.* at 282. She argued that the addition of the "substantial contributing factor" requirement to her pending suit against DaimlerChrysler was unconstitutional because it deprived her of a vested right. *Id.* at 285. The trial court agreed and denied DaimlerChrysler's motion to dismiss Hurst's claim. *Id.* at 282.

Reversing that ruling, the appellate court stated that when Hurst filed suit she was pursuing a common law tort theory and had, at most, a mere expectation that the common law would not be altered by legislation. *Id.* at 286–87. The court held that Hurst did not have a vested right, and it distinguished her expectancy from cases in which claimants had obtained a judgment before the effective date of a statute or had a right to recover a definite sum of money that was due when the new legislation passed. *Id.* at 287; *see Flowserve Corp. v. Bonilla*, 952 So.2d 1239 (Fla.Ct. App.2007) (relying on *Hurst* to quash trial court's order that held Asbestos and Silica Compensation Fairness Act unconstitutional).

Here, it is undisputed that final judgment had not been entered before the enactment of chapter 149. Similar to the claimants in *Dickson* and *Hurst*, Satterfield had only an expectation that her statutory remedy would remain unchanged. Like the insurer in *Richardelle*, Satterfield sought recovery from a non-tortfeasor, relying on a vicarious-liability theory that was unavailable at common law and to which she had no vested right.

Furthermore, the partial summary judgment entered by the district court did not transform Satterfield's expectation of a successor-liability remedy under New York law into a vested right. That judgment was not final when chapter 149 became effective four days later. The district court would have been able to reconsider its ruling on the partial summary judgment and reverse it. *See Elder Const., Inc. v. City of Colleyville*, 839 S.W.2d 91, 92 (Tex.1992). Satterfield cannot maintain her vested-right argument based on a trial-court ruling that was interlocutory. *See Middleton*, 185 S.W. at 561 (concluding that law may be changed by legislature so long as it does not destroy or prevent adequate enforcement of vested rights); *Dickson*, 139 S.W.2d at 259–60 (setting aside default judgment that was not final and was not immune to subsequent legislative action).

Satterfield has not demonstrated that chapter 149 violates the constitutional prohibition against retroactive laws because she has not shown that she had a vested right to a successor-liability remedy through choice-of-law rules. *See De Cordova*, 4 Tex. at 479–80 (recognizing that constitutional prohibition against retroactive laws is not violated without destruction or impairment of vested right); *see also Corpus Christi People's Baptist Church*, 904 S.W.2d at 626 (same); *Project Principle, Inc.*, 724 S.W.2d at 390 (same).

### Abrogation of remedy

The majority opinion further misdirects the constitutional inquiry by relying on a case interpreting the Pennsylvania Constitution, which has no prohibition against retroactive laws. In that case, a closely split court invalidated a successor-liability statute under the open courts provision of the Pennsylvania Constitution because the statute eliminated the claimants' remedy. *See Ieropoli v. AC & S Corp.*, 577 Pa. 138, 842 A.2d 919, 932 (2004). At least three significant problems arise with the majority's reliance on that case: (1) Satterfield never raised an open-courts challenge to chapter 149 in response to Crown's summary-judgment motion; (2) the invalidated Pennsylvania statute was broader (affording an affirmative defense to a larger, less-innocent set of corporate successors) than

the one at issue here; and (3) over four pages are devoted to discussion of non-binding Pennsylvania authority but the Fifth Circuit's application of Texas law to a statute challenged on open courts grounds as barring the claimant's remedy is reduced to a footnote.[16] *See Jones v. Pullman Kellogg Corp.*, 785 F.2d 1270 (5th Cir.1986). If the majority is inclined to consider an open courts provision, it should be the provision in the Texas Constitution. Additionally, it is my opinion that the Fifth Circuit's interpretation of the law has greater persuasive value in this Texas case than that of a court in Pennsylvania, construing a broader statute and a different constitution in the context of an open courts challenge that is not before this Court.

The Texas Supreme Court has long held that laws affecting a claimant's remedy in pending cases—providing a new statutory defense for instance—are constitutional if the claimant's remedy is not taken away entirely. *See City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex.1997) (citing *De Cordova*, 4 Tex. at 480); *see also Burlington N. & Santa Fe Ry. Co. v. Skinner Tank Co.*, 419 F.3d 355, 359–60 (5th Cir.2005). Quoting the supreme court in *Likes*, Satterfield acknowledges that a statute does not violate the constitutional prohibition against retroactivity if it affords a reasonable time or fair opportunity to preserve a claimant's rights under the former law, or if the amendment does not bar all remedy. 962 S.W.2d at 502. Additionally, the supreme court has concluded that a grace period is unnecessary when, as here, its

inclusion would defeat the very purpose of the statute. *Owens Corning*, 997 S.W.2d at 573. Thus, even if Satterfield somehow had a vested right to impose successor liability against Crown, chapter 149 will pass constitutional muster, even without a grace period, if it does not completely deprive her of remedies for the tort claims in her suit.

Arguing that her claims were "completely extinguished," Satterfield compares chapter 149's effect on her suit to that of the legislation challenged by the claimants in *Likes*. 962 S.W.2d at 489. However, the legislation at issue in *Likes* reclassified the city's storm sewer operation as a governmental function for which the city could not be sued-even though operation and maintenance of the sewers had been classified as proprietary functions for which a city could have been sued at common law. *Id.* at 502. As a result of the statutory reclassification, cities were immune from every suit alleging negligent maintenance of its storm sewers, and a claimant's recovery of any amount from a municipal defendant for such claims was forever barred. *See id.* By contrast, chapter 149 does not grant immunity from suit to every asbestos-manufacturer's successor, and it does not bar Satterfield's cause of action. *Compare id., with* Tex. Civ. Prac. & Rem.Code Ann. § 149.003.[17]

In contrast to the challenged statute in *Likes*, chapter 149 does not cause complete deprivation of a legal remedy. Applying Texas law, the Fifth Circuit has recognized that a statute does not leave a claimant

---

**16.** The sole Texas decision concerning the constitutionality of chapter 149, on facts remarkably similar to this case, is not considered by the majority opinion. *See Robinson v. Crown Cork & Seal Co.*, 251 S.W.3d 520, 523 (Tex.App.-Houston [14th Dist.] 2006, pet. granted).

**17.** In *Likes*, "entirely taken away" equated not to a cap on the amount of a defendant's statutory liability or the pursuit of money in addition to any other defendant's paid settlement, but an absolute abrogation of remedy for the injuries alleged, yielding the claimant a total recovery of zero dollars. That was not the case here.

"without any 'viable' defendants or 'effectively den[y] a cause of action'" when she has claims remaining against other defendants. *Jones*, 785 F.2d at 1273 (citing *Nelson v. Metallic–Braden Bldg. Co.*, 695 S.W.2d 213, 215 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.)); *see also Gomez v. Pasadena Health Care Mgmt.*, 246 S.W.3d 306, 314 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (concluding that three-year survival statute for minor's health-care liability claim did not effectively abrogate claimant's right to redress against medical center and its general partner because claimant had alternative remedy of suit against physicians); *Wilson v. AC & S, Inc.*, 169 Ohio App.3d 720, 864 N.E.2d 682, 695 (2006) (holding that new statute, which required proof that asbestos exposure was substantial contributing factor to claimant's medical condition, could be applied to pending cases and did not abrogate claimant's vested right because she was still able to pursue her cause of action and recover for injury caused by her husband's exposure to asbestos; statute merely affected methods and procedure by which that action was recognized, protected and enforced, not the cause of action itself), *appeal dism'd*, 113 Ohio St.3d 1457, 864 N.E.2d 645 (2007).

In *Jones*, the widow of a Gulf Oil refinery worker brought a wrongful death and survivorship suit against Pullman Kellogg and appealed the trial court's dismissal of her case on summary judgment. *Id.* at 1271. She alleged that from the mid–1960s until 1975 her husband worked around a fluid catalytic cracking unit that was designed by Pullman Kellogg, and that he was continually exposed to polynuclear aromatic hydrocarbons which ultimately caused his lung disease. *Id.* Pullman Kellogg responded that the ten-year statute of repose for suits against architects and engineers barred Jones's suit. *Id.* Jones asserted that the statute violated the open courts clause of the Texas Constitution because her suit was barred before her husband's injury manifested itself. *Id.* at 1272.

Affirming the constitutionality of the statute, the Fifth Circuit concluded that Jones still had a legal remedy because she was able to pursue her claims against other defendants. *See id.; see also Gomez*, 246 S.W.3d at 314; *Wilson*, 864 N.E.2d at 695. The court noted that Jones had sued her husband's employer as well as thirteen manufacturers and suppliers of asbestos-containing products and that she had entered into settlement agreements with several of them.[18] *Id.*

Satterfield's legal position is similar to Jones's because chapter 149 does not prevent Satterfield from pursuing her remedies or recovering all of her damages, jointly and severally, from numerous other defendants (nor does it affect any settlement that she has already received in this case). Accordingly, chapter 149 does not

---

**18.** *Jones* illustrates the factual basis for a Texas court's rejection of the argument that a claimant was left without any viable defendants or effectively denied a cause of action. For over a century, the Texas Supreme Court has recognized that laws affecting a remedy are not unconstitutionally retroactive unless the remedy is entirely taken away. *See De Cordova* 4 Tex. at 480 (1849); *see also Burlington N. & Santa Fe Ry. Co. v. Skinner Tank Co.*, 419 F.3d 355, 359–60 (5th Cir.2005); *City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex.1997). The majority states that *Jones* "did not consider whether such a law would violate the Texas Constitution's express prohibition against retroactive laws in article I, section 16." However, that is not a relevant concern. Retroactivity is a non-issue if the claimant is not completely deprived of a remedy. *Jones* offers assistance in understanding what facts do not constitute complete abrogation of a claimant's remedy and for that reason, it is entirely instructive here.

violate the constitutional prohibition against retroactive laws in article I, section 16.

Furthermore, there is no violation of article I, section 16 because chapter 149 is a remedial statute that could be applied to pending cases. *See Exxon Corp. v. Brecheen,* 526 S.W.2d 519, 525 (Tex.1975) (holding that statute which became effective after claimant's death but prior to the trial of wrongful death case was remedial, constitutional; and governed pending litigation proceedings that were pending when statute was enacted); *De Cordova,* 4 Tex. at 477 (recognizing that laws merely regulate the remedy are not within constitutional prohibition against retrospective laws); *Villiers v. Republic Fin. Servs., Inc.,* 602 S.W.2d 566, 572 (Tex.App.-Texarkana 1980, writ ref'd n.r.e.) (noting that generally, statutes concerning remedies are to be applied to actions tried after their passage even though action arose beforehand); *Sergeant Enters., Inc. v. Strayhorn,* 112 S.W.3d 241, 250 (Tex.App.-Austin 2003, no pet.) (recognizing that remedial statutes may be applied to pending cases because they usually do not affect vested right); *see* 16A C.J.S. *Constitutional Law* § 267 (1986) ("A statute which relates merely to matters of remedy may be made applicable to pending proceedings at any time before the final judgment of the court becomes effective."). A remedial statute is one that introduces a new regulation for the advancement of the public welfare or conducive to the public good, affords a remedy, improves and facilitates existing remedies, or corrects defects, mistakes, and omissions in the laws of the State. *Lukes v. Employees Ret. Sys. of Tex.,* 59 S.W.3d 838, 842 (Tex.App.-Austin 2001, no pet.) (citing *Sims v. Adoption Alliance,* 922 S.W.2d 213, 217 (Tex.App.-San Antonio 1996, writ denied)).

Chapter 149 is a remedial statute because it corrected an omission in Texas law concerning the post-merger successor liability of foreign corporations. Chapter 149 also addressed the long-tailed, unpredictable asbestos-related liabilities that may bankrupt successor corporations:

> A corporation is currently liable up to its total value for all injuries it causes. If that corporation merges with a much larger corporation, however, the successor corporation is liable for the injuries caused by its predecessor (even though not caused in any way by the successor) up to the successor's much higher value. In the case of long-tailed and unknown asbestos-related liabilities, a much larger successor can easily be bankrupted by the asbestos-related liabilities it innocently received from a much smaller predecessor with which it merged many decades ago. To eliminate that unfairness—and even to save successor corporations from bankruptcy—some have proposed a new rule limiting liability especially for asbestos-related successor liabilities acquired solely through a merger.... [Under this rule], any asbestos-related liabilities acquired solely through a merger would be traced back through one or more mergers to the original transferor who did something related to asbestos that actually resulted in harm. The total of transferred liabilities that the successor corporation had to pay would be limited to the value (adjusted upward for time and inflation) of the total gross assets of the original transferor that caused those same liabilities.

H.J. of Tex., 78th Leg., R.S. 6042–43.

Because chapter 149 is a remedial statute that could be applied to pending cases and because the statute did not bar Satterfield from pursuing her claims against

multiple other defendants, it is constitutional under article I section 16.

### Police power

The next fundamental flaw in the majority opinion is that it does not recognize the legislature's right to reasonably exercise its police power after balancing the competing considerations on its own. Dismissing chapter 149 as being enacted under the mere "guise" of police power, the majority posits that the needs of the public are distinct from the financial protection of a particular private-business segment. But the connection between the solvency of a particular business segment and potential public harm is evident to Satterfield, who does not dispute the significance of the asbestos-litigation crisis to non-tortfeasor successor corporations or the potential effects of their bankruptcies on Texas jobs and state revenue. The Supreme Court has also made the connection between support of a business sector and prevention of public harm, holding that protection of the people's vital interests is not limited to health, morals and safety, but extends to economic needs as well. *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38–39, 60 S.Ct. 792, 84 L.Ed. 1061 (1940) (upholding state statutes designed to protect solvency of building and loan associations as constitutional exercise of state's police power); *see also Brand v. Korth*, 128 Tex. 488, 99 S.W.2d 285, 287 (1936) (recognizing that exercise of legislative police power extends to safeguarding solvency of banks). Contrary to the majority's declaration that the legislature's enactment of chapter 149 is outside the scope of the police power, the Supreme Court has determined that legislation aiming to benefit state residents and their economic interests—by increasing state industries, developing its resources, and adding to its wealth and prosperity—is embraced by the police power. *Barbier v. Connolly*, 113 U.S. 27, 31, 5 S.Ct. 357, 28 L.Ed. 923 (1885); *see also Jefco, Inc. v. Lewis*, 520 S.W.2d 915, 922 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e) (citing *City of Coleman v. Rhone*, 222 S.W.2d 646, 648 (Tex.Civ.App.-Eastland 1949, writ ref'd)). Chapter 149 serves the public goals recognized by the Supreme Court. It seeks to minimize financial peril to non-tortfeasor successor corporations and reduce risks to jobs and pensions, which promotes the state's prosperity and addresses proper subject matter for the exercise of legislative police power.

"A large discretion is necessarily vested in the Legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests." *State v. Richards*, 157 Tex. 166, 301 S.W.2d 597, 602 (1957); *Grothues v. City of Helotes*, 928 S.W.2d 725, 729 (Tex.App.-San Antonio 1996, no writ) ("As the affairs of the people and government change and progress, so the police power changes and progresses to meet the needs.") (quoting *City of Breckenridge v. Cozart*, 478 S.W.2d 162, 165 (Tex.Civ.App.-Eastland 1972, writ ref'd n.r.e.)). Accordingly, whether a legislative act will serve a public use or purpose is, in the first instance, a question for the determination of the legislature, and that determination or decision cannot be reviewed and the contrary determined by the judiciary except in instances where the legislative determination of the question is palpably and manifestly arbitrary and incorrect. *Rhone*, 222 S.W.2d at 649 (quoting *Neal v. Boog–Scott*, 247 S.W. 689, 691 (Tex.Civ.App.-Beaumont 1923, no writ)); *see also Jefco*, 520 S.W.2d at 922 (citing *Rhone*, this Court stated that wisdom of exercise of police power is largely for legislative rather than judicial determination, courts will not disturb exercise of police power unless it was unnecessary and unreasonable, and if difference of opinion exists as to its

necessity and reasonableness, courts will not invalidate it).

Because operation of the police power often results in the abridgment of private rights, *Spann v. Dallas*, 111 Tex. 350, 235 S.W. 513, 515 (1921), individual hardship is balanced against the statute's public advantages in determining whether a statute is a valid exercise of police power, *State v. City of Austin*, 160 Tex. 348, 331 S.W.2d 737, 743 (1960); *Texas State Teachers Ass'n v. State*, 711 S.W.2d 421, 424 (Tex. App.-Austin 1986, writ ref'd n.r.e.).

Here, the legislature enacted a limitation on the asbestos-related liability of non-tortfeasor successor corporations to contain the financial peril threatening non-tortfeasor successor corporations and to reduce the resulting risks to Texans' jobs and pensions [19] when the financial stability of those corporations is jeopardized by successor-liability litigation. The statement of legislative intent expresses the policy behind the law and the harm that it was intended to address:

> Corporations actually in the asbestos business and their successors through merger have been financially drained by decades of litigation. As a result, nearly 70 such corporations have sought protection through bankruptcy. The cost in jobs and pension benefits, to cite just two examples, has been substantial. This legislation seeks to help keep remaining hard-pressed successors out of bankruptcy.

H.J. of Tex., 78th Leg., R.S. 6044.

To attain these objectives and after balancing the competing interests, the legislature expressly decided to apply chapter 149 to pending cases. *See* Tex. Civ. Prac. & Rem.Code Ann. § 149.001 (mandating application of chapter 149 to all cases "in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after that effective date."); *Lebohm v. City of Galveston*, 154 Tex. 192, 275 S.W.2d 951, 955 (1955) (op. on reh'g) (stating that police power includes legislative authority to withdraw remedies for causes of action when that withdrawal "is a reasonable exercise of the police power in the interest of the general welfare."); *see also Quick v. City of Austin*, 7 S.W.3d 109, 136 (Tex.1999) (Hankinson, J., dissenting) (noting that "[w]hether to apply a statute retroactively is, for very good reasons, a legislative policy choice"). Through May 2003, Crown had already paid successor asbestos-related claims totaling more than $413 million. If it had been required to continue paying such claims, Crown would have been threatened with bankruptcy—the precise consequence that the legislature sought to prevent for all similarly situated corporations.

Satterfield concedes that the legislature may enact laws that affect pending matters—if the legislation addresses water conservation, protection of the environment or children, or the regulation of professions, zoning, or handguns—because valid exercise of police power in the public interest is a recognized exception to the unconstitutionality of laws with potential retroactive effect. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex.2003) (citing *Barshop v. Medina County Underground Water Dist.*, 925 S.W.2d 618, 633–34 (Tex.1996)); *see also Kilpatrick v. State Bd. of Regis-*

---

**19.** The expansion of successor-liability asbestos litigation affects Texas residents. Crown's former secretary and general counsel, Richard Krzyzanowski, testified that Crown's subsidiaries or affiliates produce beverage cans at facilities in Conroe, Sugarland, and Abi-lene. Those three facilities employ almost 1,000 Texans and contribute $5 million in property and franchise taxes to the state. Krzyzanowski further noted that Crown's corporate family includes approximately as many Texas retirees as employees.

*tration for Prof'l Eng'rs*, 610 S.W.2d 867, 871 (Tex.Civ.App.-Fort Worth 1980, writ ref'd n.r.e) ("The constitutional rules against impairing contracts and retroactive laws are not absolute and must yield to a state's right to safeguard the public safety and welfare.").[20]

However, she also argues that the prohibition against retroactive laws in article I, section 16 of the Texas Constitution's Bill of Rights is strengthened by article I, section 29 of the constitution, which states that everything in the Bill of Rights "is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto . . . shall be void." *See* Tex. Const. art. I, § 29.

Satterfield fails to explain the evident inconsistency between (1) her recognition of the constitutionality of applying certain police-power-enacted laws (involving water conservation; protection of the environment and children; and regulation of professions, zoning, and handguns) to pending claims, and (2) her assertion that article I, section 29 prohibits all retroactive laws. *See id.* art. I, §§ 16, 29.[21] Because Satterfield concedes that, at least in some instances, the legislature may enact laws under its police power that apply to pending claims without running afoul of the Texas Constitution, there is no need to attempt to reconcile the inconsistency in her argument.[22]

**20.** The question of "whether the legislature reasonably exercised its police power to enact a retroactive law" has been answered at least twice by the author of the majority opinion, who stated that, "[w]hile article 1, section 16 of the Texas Constitution expressly forbids retroactive legislation, it has been consistently construed not to invalidate all retroactive legislation." *Institute of Cognitive Dev., Inc. v. Texas Dep't of Mental Health & Mental Retardation*, No. 03–98–00376–CV, 1999 WL 435112, at *4, 1999 Tex.App. LEXIS 4780, at *13 (Tex.App.-Austin 1999, no pet.). The author further noted that "valid exercise of the police power by the legislature to safeguard the public safety and welfare can prevail over a finding that a law is unconstitutionally retroactive." *Id.* at *7, at *22 (citing *Barshop v. Medina County Underground Water Dist.*, 925 S.W.2d 618, 637–38 (Tex.1996); *Texas State Teachers Ass'n v. State*, 711 S.W.2d 421, 424 (Tex.App.-Austin 1986, writ ref'd n.r.e.)).

The majority's discussion of legislative police power contains conflicting assertions. On the one hand, it states that "the Texas Legislature has no power, police or otherwise" to enact a retroactive law. On the other hand, just four pages later, it recognizes that in *Barshop* and other cases, the legislature's enactment of laws that applied to pending causes of action "may have involved a valid exercise of police power."

**21.** The utility of article I, section 29 of the Texas Constitution has been questioned:

Presumably section 29 was designed as a closing flourish to emphasize the importance of the Bill of Rights. Unfortunately, it is not clear just what it means and one is left with the suspicion that despite the apparently strong language it means nothing at all. Section 29 has been cited in relatively few cases and in them the decision typically turned on another section of the Bill of Rights cited with section 29.... Section 29 seems to be a meaningless provision of the Bill of Rights. It is not even the aid to rigid construction which it might appear to be.... Article I today is redundant, confusing, partially obsolete and in places highly technical. In its present form its justification is history not logic.

1 George D. Braden, et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 85–86 (1977).

**22.** The Texas Supreme Court has observed that meaning of the Texas Constitution must be sought with the understanding that it "was ratified to function as an organic document to govern society and institutions as they evolve through time." *Davenport v. Garcia*, 834 S.W.2d 4, 19 (Tex.1992). If the majority's interpretation of article I, section 29 is legally sound, then all contemporary Texas statutes that place any limit whatsoever on the freedoms of speech, press, or religion; the right of due process; or any other provision in the bill of rights, are unconstitutional.

Courts are reluctant to disturb legislative action on subject matter that lies within the police power and will not do so unless it clearly appears that the regulation is unnecessary, unreasonable,[23] and unjustified by the facts. *Bellaire v. Lamkin,* 159 Tex. 141, 317 S.W.2d 43, 45–46 (1958) (citing *Rhone,* 222 S.W.2d at 649); *Jefco, Inc.,* 520 S.W.2d at 922; *Martin v. Wholesome Dairy Inc.,* 437 S.W.2d 586, 591–92 (Tex.Civ.App.-Austin 1969, writ ref'd n.r.e.). As the Texas Supreme Court has stated, *"If there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the police power, the courts will not hold it void." Bellaire,* 317 S.W.2d at 45–46 (emphasis in original); *Jefco,* 520 S.W.2d at 922; *Martin,* 437 S.W.2d at 592.

Satterfield has not made it clearly apparent that chapter 149 is unnecessary, unreasonable, and unjustified by the facts. *See Bellaire,* 317 S.W.2d at 45–46. To invalidate chapter 149, Satterfield would have this Court reject the statement of legislative intent accompanying the statute's enactment. However, because there is room for a fair difference of opinion as to the necessity and reasonableness of chapter 149 on subjects that lie within the police power (i.e., promotion of the public interest in jobs and pensions, increasing state industries, developing its resources, and adding to its wealth and prosperity), this Court will not hold it void. *See id.; see also Barshop,* 925 S.W.2d at 634 (holding that Edwards Aquifer Act's cap on landowners' water withdrawal was necessary to safeguard public welfare and that

consideration of preexisting users' water consumption before effective date of Act did not render Act unconstitutional).

Chapter 149 handles competing economic interests: having a remedy available for claimants by shifting tort liability to successor corporations versus minimizing financial risk to successor corporations and the jobs and pensions provided by those corporations. Balancing these competing interests is a quintessential function of the legislature, not the judiciary. *See City of Rockwall v. Hughes,* 246 S.W.3d 621, 626 n. 38 (Tex.2008) (Willett, J., dissenting).

Having concluded that Satterfield failed to demonstrate the unconstitutionality of applying chapter 149 to this case, consideration is given to her next constitutional challenge: whether chapter 149 constitutes a special law.

### Constitutional challenge under article III, section 56

In her second issue, Satterfield argues that chapter 149 "singles out Crown and Crown alone" for special treatment in violation of the Texas Constitution's prohibition against special laws. *See* Tex. Const. art. III, § 56. This argument presents a facial challenge to the statute, requiring Satterfield to demonstrate that there is "no possible state of facts" under which the statute would be constitutional. *See Texas Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 520 (Tex.1995). Crown responds that chapter 149 is not a special law because it is applicable to a substantial class and its classifications are reasonable.

A special law is limited to a particular class of persons distinguished by some

---

**23.** The majority asserts that legislative intent and an assessment of a statute's reasonableness are impossible without something akin to Congressional findings. But as the Texas Supreme Court has stated, the "surest guide to legislative intent" is in the words that the legislature chooses to use in a statute. *Leland*

*v. Brandal,* 257 S.W.3d 204, 206 (Tex.2008) (quoting *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 866 (Tex.1999)). Interestingly, in the paragraph immediately following this assertion, the majority concludes that chapter 149 is not a reasonable exercise of legislative police power.

characteristic other than geography. *Ford Motor Co. v. Sheldon*, 22 S.W.3d 444, 450 (Tex.2000); *Maple Run at Austin Mun. Util. Dist. v. Monaghan*, 931 S.W.2d 941, 945 (Tex.1996). Article III, section 56 of the Texas Constitution enumerates thirty contexts in which "the Legislature shall not, except as otherwise provided in this Constitution, pass any local or specialized law." Additionally, "in all other cases where a general law can be made applicable, no local or special law shall be enacted." Tex. Const. art. III, § 56.[24]

Broad authority rests with the legislature to make classifications for legislative purposes. *Sheldon*, 22 S.W.3d at 450; *Juliff Gardens, LLC v. Texas Comm'n on Envtl. Quality*, 131 S.W.3d 271, 281 (Tex. App.-Austin 2004, no pet.). Legislative classifications "must be broad enough to include a substantial class and must be based on characteristics legitimately distinguishing such class from others with respect to the public purpose sought to be accomplished by the proposed legislation." *Sheldon*, 22 S.W.3d at 451 (upholding reasonableness of statutory classification of class actions involving motor vehicle licensees because automobile is one of consumers' largest and most important purchases and class actions involving automobiles affect many individuals); *Juliff Gardens*, 131 S.W.3d at 281 (upholding reasonableness of statutory classification of proposed landfills because those landfills were less regulated than others and their resulting pollution had potential to affect population centers, aquatic habitat, and recreational fishing).

In determining whether a statute is a special law, it is appropriate to examine the statute's legislative history. *Juliff Gardens*, 131 S.W.3d at 282 n. 7. "The primary and ultimate test of whether the law is general or special is (1) whether there is a reasonable basis for the classification made by the law, and (2) whether the law operates equally on all within the class." *Sheldon*, 22 S.W.3d at 451 (quoting *Rodriguez v. Gonzales*, 148 Tex. 537, 227 S.W.2d 791, 793 (1950)). Before a statute will be nullified by the constitutional proscription of article III, section 56, it must clearly appear that there is no reasonable basis for the classification adopted by the legislature to support the statute. *County of Cameron v. Wilson*, 160 Tex. 25, 326 S.W.2d 162, 167 (1959). As this Court observed, "If there could exist a state of facts justifying the classification or restriction complained of, courts will assume that it existed." *Inman v. Railroad Comm'n*, 478 S.W.2d 124, 127 (Tex.Civ.App.-Austin 1972, writ ref'd n.r.e.) (quoting *Reed v. City of Waco*, 223 S.W.2d 247, 252 (Tex. Civ.App.-Waco 1949, writ ref'd)).

Because Satterfield does not allege that chapter 149 applies unequally to those within the defined class, her special-law challenge can succeed only if she demonstrates the first prong of the special-law test: that the legislative classifications in chapter 149 are unreasonable and bear no substantial relation to objectives sought to be accomplished by the act. *See Sheldon*, 22 S.W.3d at 451; *Monaghan*, 931 S.W.2d at 946.

### Reasonableness of classifications

Satterfield argues that chapter 149 "creates an unconstitutional special class of one" and that its narrowly defined class is not reasonably related to the statute's "purported goals." She specifically asserts that: (1) details defining the class fit Crown and it is the only corporation

---

**24.** This general prohibition does not preclude the legislature from passing special laws for preservation of Texas fish and game and fence laws "as may be needed to meet the wants of the people." Tex. Const. art. III, § 56(b)(1), (2).

known to have raised the statutory defense; (2) a class that includes only Crown is not reasonably related to the objective of saving corporate successors on the verge of bankruptcy; and (3) a senator's remark about the "Crown Cork and Seal asbestos issue" reveals that chapter 149 created only a "pretend" class.

### 1. Classification details

First, Satterfield states that the details defining the class in chapter 149 were tailored to fit Crown's corporate history and that Crown has been unable to identify another corporation encompassed by the statute's classifications. But she concedes that Crown had no legal burden to make that identification. As the party that initiated the challenge to the constitutionality of chapter 149, Satterfield had the burden of demonstrating its unconstitutionality. *See Walker v. Gutierrez,* 111 S.W.3d 56, 66 (Tex.2003). She cannot prevail by attempting to shift her burden of proof to Crown. Satterfield has not referenced any case striking a statute as a special law solely because the potential class size was small. Rather, the test of a special law is whether there is a reasonable basis for the classification and whether the law operates equally on all within the class. *Sheldon,* 22 S.W.3d at 451. Merely because Crown is the only entity to assert the applicability of chapter 149 thus far does not mean that any other corporate successor that may have failed to do so is statutorily ineligible. As the supreme court has recognized, the fact that a statute that may have applied to only one entity when it was enacted does not compel the conclusion that it is a special or local law if it is "not so inflexibly fixed" as to prevent it from ever being applicable to others. *Bexar County v. Tynan,* 128 Tex. 223, 97 S.W.2d 467, 469–70 (1936) (considering legislation applicable to only one county).

Second, Satterfield criticizes chapter 149's use of May 13, 1968, as the merger deadline for a successor corporation to become eligible for the asbestos-liability limitation. *See* Tex. Civ. Prac. & Rem.Code Ann. § 149.002(a). She claims the classification is unreasonable because the Texas Department of Health suspected the hazards of asbestos since 1958 and had adopted a workplace regulation capping the concentration of asbestos dust at 5 million particles per cubic feet of air ("mppcf"). That regulation approved of the listed concentrations as "generally safe" and noted that the concentrations "were not maximum values" but could be momentarily exceeded.

However, Satterfield has not clearly demonstrated that there is no reasonable basis for the legislative classification concerning the May 13, 1968 merger deadline. *See Wilson,* 326 S.W.2d at 167; *see also Smith v. Davis,* 426 S.W.2d 827, 831 (Tex. 1968) (stating that mere difference of opinion, where reasonable minds could differ, is insufficient basis for striking legislation as arbitrary or unreasonable). In 1968, the American Conference of Governmental Industrial Hygienists (ACGIH) tightened the asbestos concentration standard significantly, cutting the limit by more than half to 2 mppcf. H.J. of Tex., 78th Leg., R.S. 6044. The ACGIH first adopted that change on May 13, 1968, following Dr. Irving Selikoff's issuance of his "famous warnings in the mid–1960s about the dangers of asbestos in the workplace." *Id.*

According to the statement of legislative intent, the classification that required the original transfer of successor asbestos liabilities to have occurred before May 13, 1968, was included to concentrate the liability limitation on innocent successor corporations. *Id.* at 6043–44. Logically, successors that had not engaged in the asbestos business, did not intend to take

over their predecessors' asbestos business, and merged before 1968 were unlikely to have known about any workplace asbestos regulation—much less that Texas's standard 5 mppcf limit was unsafe. *See id.* I am unpersuaded that the merger deadline in chapter 149 is unreasonable.

Third, Satterfield asserts that the successor-to-successor provision in chapter 149 was designed specifically for Crown, which changed its state of incorporation from New York to Pennsylvania by merger and consolidation in 1989. I disagree. Chapter 149 was intended to allow successors who receive only the same bundle of original asbestos liabilities through successive mergers to plead the liability limits applicable to the first pre–1968 successor. *Id.* at 6043; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 149.002(a). Without this provision, chapter 149 would be ineffective to accomplish its legislative intent: corporations that currently satisfy chapter 149 but subsequently merge with another corporation would relinquish their eligibility for the liability limitation, even though their culpability for asbestos-related claims would still be nonexistent. And without this provision, as Crown notes, claimants who could not sue the intermediate successor would have a revived cause of action against an equally innocent corporation that is even further removed from the corporation from which the liability derived.

Courts must reject interpretations of a statute that defeat the purpose of the legislation, so long as another reasonable interpretation exists. *Nootsie, Ltd. v. Williamson County Appraisal Dist.,* 925 S.W.2d 659, 662 (Tex.1996); *see Webb County Appraisal Dist. v. New Laredo Hotel, Inc.,* 792 S.W.2d 952, 954 (Tex.1990) (cautioning that the legislature is not presumed to have done "a useless act"). In-

clusion of the successor-to-successor provision in a statute designed to address the long-tailed, unpredictable asbestos-related liabilities that may bankrupt successor corporations, *see* H.J. of Tex., 78th Leg., R.S. 6043, bears a substantial relation to the legislative objectives sought. *See Sheldon,* 22 S.W.3d at 451; *Monaghan,* 931 S.W.2d at 946.

## 2. Bankruptcy risk

Satterfield next contends that chapter 149 is not rationally related to the objective of averting bankruptcy for corporate successors because Crown is not at risk of bankruptcy. For the reasons that follow, I conclude that Crown's inclusion in the class of successor corporations attempting to avert bankruptcy is reasonable.

Through May 2003, Crown compensated claimants in an amount that exceeded Mundet's adjusted fair market value almost six times—paying over $413 million. Crown states that its continued responsibility to pay such claims would have posed a bankruptcy threat. It has already refinanced $1 billion of debt in 2003 to continue its operations, and it will have to pay $1 billion of that refinanced debt in 2008. As Crown noted in its annual report filed with the United States Securities and Exchange Commission, the fate of recent legislation limiting successor liability could materially affect Crown's operations, financial position, and cash flow.

However, chapter 149 does not require deviation from some threshold of solvency before the statute will apply to a corporate successor. Rather, chapter 149 sought to address unfairness to innocent successor corporations and stem negative economic effects on employees and pensioners. The scope of Crown's successor liability is not premised on any sale, manufacture, or distribution of asbestos-containing products, and the duration of its liability before chapter 149 was almost infinite. Unlike an

actual tortfeasor, Crown was unable to take any corrective action to minimize its potential successor-related asbestos liability. Judgments against Crown cannot function as legitimate deterrents to the alleged tortious acts or omissions of Mundet. It would not have been unreasonable for the legislature to include innocent corporate successors that have paid more than six times their predecessors' adjusted fair market value in asbestos-related claims within the classification of those eligible for the liability limit. There is a strong presumption that the legislature understands and appreciates the needs of the people and that its discriminations are based on adequate grounds. *Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W.2d 931, 934 (Tex.1996); *Williams v. Razor Enters., Inc.*, 70 S.W.3d 274, 275–76 (Tex. App.-San Antonio 2002, no pet.).

### 3. Pretend class

Satterfield further contends that a senator's remark about the "Crown Cork and Seal asbestos issue" reveals that chapter 149 created only a pretend class. A "pretended" class, as defined by this Court, is one that "manifest(s) a purpose to evade the constitution." *Public Util. Comm'n v. Southwest Water Serv., Inc.*, 636 S.W.2d 262, 265 (Tex.App.-Austin 1982, writ ref'd n.r.e.) (quoting *Clark v. Finley*, 93 Tex. 171, 54 S.W. 343, 346 (1899)).

Crown's involvement in asbestos litigation did precede the legislature's action with regard to chapter 149. During a meeting of the Texas Senate State Affairs Committee, its chair described article 17 of House Bill 4:

> Article 17, limitations in civil actions of liabilities relating to certain mergers or consolidations. This, members, is the Crown Cork and Seal asbestos issue. What we have put in this bill is what I understand to be an agreed arrangement between all of the parties in this—in this matter.

Meeting on Proposed Senate Substitute for Tex. H.B. 4, State Senate Affairs Committee, 79th Leg., R.S., 13 (Apr. 30, 2003). I disagree with Satterfield's suggestion that this shorthand reference to the issue in Article 17 reveals a purpose to evade the constitution through the creation of a pretended class that would benefit only Crown. *Cf. Finley*, 54 S.W. at 345 (citing Pennsylvania case in discussion of pretended class, which noted that its legislature had engaged in "a studied and constant effort" to evade constitutional prohibition against local and special legislation).

This Court has considered legislation with highly specific classifications, allegedly applicable to only one entity, that resemble Satterfield's special law challenge to chapter 149. *See Juliff Gardens*, 131 S.W.3d at 283. In our review of the summary judgment in *Juliff Gardens*, appellant emphasized excerpts from a Senate floor discussion as evidence that one senator was attempting to specifically "target" the Juliff landfill with the legislation. *Id.* at 282–83. The legislative classifications at issue applied only to permits that had been recommended for denial by a county commissioners' resolution, concerning landfills containing type IV waste (brush, construction-demolition waste, and/or other non-putrescible, non-household rubbish), that were located within 100 feet of a canal used for public drinking water or crop irrigation, in counties with populations exceeding 225,000, and adjacent to the Gulf of Mexico. *Id.* at 275. These statutory classifications, among others, were based on the following facts: type IV landfills were less regulated than others; the potential effects of pollution would produce greater harm to the population centers, aquatic habitat, and fishing in coastal counties; and it would be unwise to place a landfill near low-circulation canals or in

areas susceptible to hurricanes, tidal surges, and other climatic conditions. *Id.* at 284.

This Court held that the classifications were reasonable and not specifically targeted at Juliff's landfill. *Id.* at 283 & n. 8. We clarified that when presented with legislation that is challenged as a special law, "we review the reasonableness of the statute's classifications, . . . not the precipitating forces that led to its enactment." *Id.* at 283. That the legislation may have had its origin in local controversy, which then led one senator to sponsor the particular amendment that was eventually enacted, did not render it a prohibited local or special law. *Id.* at 283–84.[25]

Similarly, review for possible infringement of article III, section 56 in this case is not based on any precipitating forces leading to the enactment of chapter 149 but whether its legislative classifications are reasonable. *See Sheldon,* 22 S.W.3d at 451. For the reasons that follow, I conclude that they are.

Chapter 149 is written in general terms, applicable to all within the defined class, and does not single out any particular member of the class for special treatment. The specific classifications in chapter 149 were intended to include successor corporations that "were the most innocent about the potential hazards of asbestos" and "at the greatest financial peril, especially those threatened with bankruptcy." H.J. of Tex., 78th Leg., R.S. 6043. When the legislation was considered, concerns were raised about the substantial cost in jobs and pension benefits. *Id.* at 6044. To

address those concerns and target the most innocent successors, one classification required that the liability to be imposed must be based on the original transfer of successor asbestos liabilities that occurred prior to May 13, 1968. *Id.; see also* Tex. Civ. Prac. & Rem.Code Ann. §§ 149.001(3) (defining "successor asbestos-related liabilities"), .002(a). Subsequent successors may qualify under the statute if they receive only that same bundle of original asbestos liabilities through successive mergers. H.J. of Tex., 78th Leg., R.S. 6043; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 149.002(a).

Another classification in chapter 149 restricted the liability limitation to successor corporations that did not continue their predecessors' business of mining, selling, or distributing asbestos fibers, or manufacturing, distributing, installing, or removing asbestos-containing products. Tex. Civ. Prac. & Rem.Code Ann. § 149.002(b)(5). The legislature sought to accomplish its goals "without limiting every type of asbestos liability." H.J. of Tex., 78th Leg., R.S. 6043; *see also* Tex. Civ. Prac. & Rem.Code Ann. §§ 149.002(b)(8) (excluding from statute a successor asbestos-related liability arising from certain premises liability claims), .003(a), (b) (statute is inapplicable to corporations that have not yet exceeded their statutory limit).

Rather than demonstrating that it is a special law, the precision of the classifications in chapter 149 shows that it is narrowly tailored to serve its purposes: to prevent asbestos-related liabilities from bankrupting innocent successor corporations and creating a negative economic ef-

---

**25.** In *Juliff Gardens v. Texas Comm'n on Envtl. Quality,* we noted that specific events have led to numerous statutes that were enacted as laws of general applicability, including the AMBER alert law and the Brady bill. 131 S.W.3d 271, 282–83 (Tex.App.-Austin 2004, no pet.) (citing Tex. Gov't Code Ann. §§ 411.351–.358 (West 2005) (Statewide America's Missing: Broadcast Emergency Response (AMBER) Alert System for Abducted Children); 18 U.S.C.A. § 921–31 (West 2000 & Supp.2008) (Brady Handgun Violence Prevention Act)).

fect on employees and pensioners. *See* H.J. of Tex., 78th Leg., R.S. 6044. Through chapter 149, the legislature addressed the economic concerns that implicate the ability of successor corporations to continue to provide jobs and pension benefits. These are matters of importance to Texas and its citizens. *See Barbier*, 113 U.S. at 31, 5 S.Ct. 357; *see also Robinson*, 251 S.W.3d at 538.

Based on this record, I conclude that a reasonable relationship exists between the classifications and the objectives sought to be accomplished by chapter 149 and that article III, section 56 of the constitution is not violated. *See Davis*, 426 S.W.2d at 830. The wisdom or expediency of chapter 149 is the legislature's prerogative, not ours. *See id.* at 831. Satterfield provides alternatives to the stated reasoning of the legislature, but she does not contradict the significance of the asbestos crisis to corporations, including those doing business in Texas, or the other legislative justifications for chapter 149, and she has not shown that the classifications set forth in chapter 149 are unreasonable. For these reasons, I conclude that Satterfield has not met her burden of demonstrating that chapter 149 is a special law.

Having concluded that Satterfield's challenges to chapter 149 as a retroactive law and as a special law do not defeat the presumption of the statute's validity, *see Barshop*, 925 S.W.2d at 629, consideration must be given to the establishment of Crown's affirmative defense under chapter 149.

### Crown's summary judgment burden

Although Satterfield's second issue urged that the legislative classifications in chapter 149 were tailor-made for Crown, her third issue insists that chapter 149 does not apply to Crown at all. In her third issue, Satterfield argues that summary judgment was improper because her evidence created a fact issue about whether Crown continued the asbestos business after "acquiring" Mundet. Based on her incorrect interpretation of section 149.002(b)(5) of the civil practice and remedies code, she alleges that Crown was ineligible for chapter 149's liability limitation.

### *Stock purchase v. merger under section 149.002(b)(5)*

The parties dispute when Crown became Mundet's successor. Satterfield asserts that Crown became Mundet's successor and first incurred successor asbestos-related liabilities in 1963, after Crown's $7 million purchase of Mundet's stock. Crown contends that it became Mundet's successor in 1966 when the corporations merged. The distinction between a merger and a stock purchase is significant because of the text of chapter 149. The relevant subsection of the statute—noticeably omitted from Satterfield's brief—states that the successor-liability limitation is inapplicable to:

> a successor that, after a *merger or consolidation*, continued in the business of mining asbestos or in the business of selling or distributing asbestos fibers or in the business of manufacturing, distributing, removing, or installing asbestos-containing products which were the same or substantially the same as those products previously manufactured, distributed, removed, or installed by the transferor.

Tex. Civ. Prac. & Rem.Code Ann. § 149.002(b)(5) (emphasis added). Nothing in subsection 149.002(b)(5) addresses corporations who continue the business of asbestos after a *stock purchase*.

Nevertheless, Satterfield emphasizes that successor asbestos-related liabilities need not originate with corporate mergers. She asserts that successor asbestos-related liabilities includes those "related in

any way to asbestos claims based on the exercise of control or the ownership of stock of the corporation before the merger or consolidation." *See id.* § 149.001(3). Based on testimony from a former Mundet employee, E.J. Stansbury,[26] Satterfield contends that Crown continued Mundet's asbestos business after the 1963 stock purchase, and that Crown was therefore ineligible, under subsection 149.002(b)(5), for the statutory liability limitation. The fallacy of Satterfield's suggestion that subsection 149.002(b)(5) applies to stock purchases is revealed by the text of the statute.

### Testimony about pre-merger events

Satterfield relies on Stansbury's 1983 deposition testimony in another lawsuit to argue that there is a fact issue about whether Crown continued Mundet's asbestos business for several months after its stock purchase. However, Stansbury's testimony relates exclusively to activity *before* the 1966 Crown–Mundet merger. Stansbury testified that he was in charge of Mundet's operation in Houston between 1963 and 1964, which includes the time period when Crown purchased Mundet's stock. He was asked whether he knew Mundet employees that went to work for Crown when Mundet sold to Crown, and he responded affirmatively. He also responded affirmatively when asked whether Crown continued to sell, contract for, and fill orders for Mundet products, including those containing asbestos, for three months.[27]

Pre-merger events are irrelevant under subsection 149.002(b)(5). *See id.; see also Robinson*, 251 S.W.3d at 540. That subsection addresses a successor's continuation of its predecessor's asbestos business after their merger and excludes such a successor from the statute's liability limitation. Tex. Civ. Prac. & Rem.Code Ann. § 149.002(b)(5). The summary-judgment evidence shows that Stansbury did not work for Crown during the statutorily relevant time period—*after* the 1966 Crown–Mundet merger. Stansbury testified that he began working for B–E–H in February 1964, when B–E–H purchased Mundet's insulation division.[28] His testimony did not raise a fact issue about whether Crown continued Mundet's asbestos business after the 1966 merger. Because Stansbury's testimony fails to allege facts concerning a post-merger continuation of Mundet's asbestos business, it does not invoke subsection 149.002(b)(5).

### Evidence in pre-merger bill of sale

Satterfield also notes that Mundet's bill of sale to B–E–H in 1963 referred to Mundet as "a Division of Crown Cork & Seal," and was signed by Crown's chairman of the board on behalf of "Mundet Cork Corporation, a Division of Crown Cork & Seal Company, Inc." Like Stansbury's testimony, this evidence too, fails to raise a fact question about whether Crown is excluded from chapter 149's limitation of liability because the bill of sale predates the 1966 Crown–Mundet merger. The plain language of the statute concerns a successor's continuation of its predecessor's asbestos-related business "*after* a merger or consolidation." *See id.* (emphasis added); *see also Robinson*, 251 S.W.3d at 540.

---

**26.** Stansbury is deceased.

**27.** It is undisputed that Stansbury did not participate in the stock-purchase transaction, did not work at the location where the transaction was handled, and knew nothing about the transaction or Mundet's independent existence.

**28.** It is undisputed that B–E–H acquired Mundet's employees as part of B–E–H's purchase of Mundet's insulation division on February 8, 1964.

The entirety of Satterfield's summary judgment evidence relates to pre-merger events before 1966, none of which constitute continuing the asbestos-related business as defined in subsection 149.002(b)(5). *See* Tex. Civ. Prac. & Rem.Code Ann. § 149.002(b)(5); *see also Robinson,* 251 S.W.3d at 540.

### *Crown's uncontroverted evidence*

Crown produced uncontroverted summary judgment evidence from its former secretary and general counsel, Richard Krzyzanowski, who averred that Crown never engaged in the asbestos business. He explained that by the time of Crown's 1966 merger with Mundet, Mundet had divested itself of its previous insulation operations. Krzyzanowski further averred that Crown itself "never manufactured, distributed, advertised, sold, or installed any asbestos-containing or other insulation products."

Based on this record, I conclude that Satterfield failed to raise an issue of material fact concerning Crown's continuation in the business of asbestos after the merger that would trigger the exclusion of section 149.002(b)(5) of the civil practice and remedies code and that Crown has demonstrated its entitlement to summary judgment based on the limitation of liability in chapter 149.

### CONCLUSION

The theory of successor liability serves a useful function in Texas law, but it is not recognized as one of the "great and essential principles of liberty and free government" that receive constitutional protection. *See* Tex. Const. art. I. The majority declares that the trial court erred in granting summary judgment, but in doing so, it rejects certain holdings of the Texas Supreme Court and persuasive authority from the Fifth Circuit, as well as principles recognized in the author's own prior opinions. Furthermore, by accepting Satterfield's invitation to invalidate chapter 149, the majority unnecessarily binds the legislature to existing choice-of-law rules.

The trial court ruled correctly in granting this summary judgment. Satterfield failed to meet her heavy burden of demonstrating that chapter 149 is unconstitutional as applied to her case under article I section 16 or under article III section 56 of the Texas Constitution, and Crown conclusively established its affirmative defense limiting its successor liability. Accordingly, I would affirm the trial court's order.